1  BITA RAHEBI (CA SBN 209351)
   BRahebi@mofo.com
2  ROSE S. LEE (CA SBN 294658)
   RoseLee@mofo.com
3  ZACH B. QUINLAN (CA SBN 348240)
   ZQuinlan@mofo.com
4  MORRISON & FOERSTER LLP
   707 Wilshire Boulevard, Suite
5  Los Angeles, California  90017-3543
   Telephone:   213.892.5200
6  Facsimile:   213.892.5454

7  RICHARD S.J. HUNG (CA SBN 197425)
   RHung@mofo.com
8  MORRISON & FOERSTER LLP
   425 Market Street
9  San Francisco, California  94105-2482
   Telephone:   415.268.7000
10 Facsimile:   415.268.7522

11 LILY YUE LI (CA SBN 287280)
   YLi@mofo.com
12 AARON D. BRAY (CA SBN 327771)
   ABray@mofo.com
13 W. STELLA MAO (CA SBN 335136)
   SMao@mofo.com
14 MORRISON & FOERSTER LLP
   755 Page Mill Road
15 Palo Alto, California  94304
   Telephone:   650.813.5600
16 Facsimile:   650.494.0792

17 Attorneys for Defendant APPLE INC.

18            UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

20

21 UUSI, LLC,                          Case No. 3:18-cv-04637-JD

22            Plaintiff,               **DEFENDANT APPLE INC.'S NOTICE
                                       OF MOTION AND MOTION FOR
23       v.                            SUMMARY JUDGMENT**

24 APPLE INC.,                         Date:   October 2, 2025
                                       Time:  10:00 a.m.
25            Defendant.               Courtroom:  11
                                       Judge:  Hon. James Donato
26
                                       Action Filed:  November 22, 2017
27                                     Trial Date:  January 26, 2026

28

1

**NOTICE OF MOTION AND MOTION**

2

TO UUSI, LLC AND THEIR ATTORNEYS OF RECORD:

3 PLEASE TAKE NOTICE that on October 2, 2025 at 10:00 a.m., or as soon thereafter as

4 the matter may be heard, in the United States District Court, Northern District of California, San

5 Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102,

6 Defendant Apple Inc. will and hereby does move the Court for summary judgment that (1)

7 Plaintiff UUSI, LLC ("UUSI") lacks Article III standing because of issue preclusion; (2) UUSI

8 lacks Article III and statutory standing because it never owned an interest in the sole asserted U.S.

9 Patent No. 5,796,183 ("the '183 patent"); (3) Apple has not indirectly or willfully infringed the

10 '183 patent; and (4) claims 37-39 of the '183 patent are invalid as indefinite.

11 This motion is based on this Notice of Motion and Motion, the accompanying

12 Memorandum of Points and Authorities, the Declaration of Lily Yue Li, the papers and records

13 on file in this action, and such other written and oral argument as may be presented to the Court.

14

15

**RELIEF REQUESTED**

16 Apple requests that the Court grant summary judgment that (1) UUSI lacks Article III

17 standing because of issue preclusion; (2) UUSI lacks Article III and statutory standing because it

18 never owned an interest in the sole asserted '183 patent; (3) Apple has not indirectly or willfully

19 infringed the '183 patent; and (4) claims 37-39 of the '183 patent are invalid as indefinite.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.   APPLE IS ENTITLED TO SUMMARY JUDGMENT OF NO ARTICLE III OR
      STATUTORY STANDING........................................................................................ 1

      A.    Statement of Facts ........................................................................................... 1

            1.    Plaintiff UUSI and Its President Mr. Rautiola. ................................... 1

            2.    Litigations Involving the '183 Patent. ................................................ 2

            3.    The '183 Patent and Its Named Inventors. ......................................... 2

            4.    UUSI's Shifting Standing Theories. .................................................... 3

                  a.    Original theory .......................................................................... 3

                  b.    Second set of theories (October 2024) ..................................... 4

                  c.    Third set of theories (May 2025) ............................................. 4

            5.    Summary of Agreements....................................................................... 5

      B.    UUSI Lacks Article III Standing to Assert the '183 Patent. ........................... 6

            1.    Issue preclusion bars UUSI from asserting the '183 patent. .............. 6

            2.    UUSI has never owned the '183 patent................................................. 8

                  a.    UUSI never acquired any named inventor's original interest. ........ 8

                  b.    UUSI lacks standing under its original theory. ........................ 9

                  c.    UUSI lacks standing under its second set of theories. ............ 10

                        (i)    UUSI does not hold Mr. Hourmand's interest. ............ 11

                               (1)    The plain language forecloses UUSI's
                                      reading............................................................ 11

                               (2)    UUSI ignores contract interpretation rules. .......... 12

                               (3)    The extrinsic evidence does not help UUSI. ......... 13

                        (ii)   UUSI does not hold Mr. Washeleski's interest. ............... 14

                        (iii)  UUSI does not hold Dr. Cooper's interest. ...................... 16

                  d.    UUSI lacks standing under its latest theories. ............................. 16

                        (i)    UUSI does not hold Mr. Hourmand's interest. ............ 17

                        (ii)   UUSI does not hold Mr. Washeleski's or Dr.
                               Cooper's interests................................................. 18

      C.    UUSI Lacks Statutory Standing to Assert the '183 Patent ................................ 21

III.  APPLE IS ENTITLED TO SUMMARY JUDGMENT OF NO WILLFUL
      INFRINGEMENT AND NO INDIRECT INFRINGEMENT........................................ 21

1

## TABLE OF CONTENTS
(continued)

2                                                                                              **Page**

3        A.    Factual Background ................................................................................... 21

4        B.    Apple Lacked the Requisite Knowledge.................................................... 21

5  IV.    APPLE IS ENTITLED TO SUMMARY JUDGMENT THAT THE '183 PATENT
         IS INVALID FOR INDEFINITENESS............................................................... 23

6        A.    Procedural Background............................................................................... 23

7        B.    "Closely Spaced" Is Indefinite.................................................................. 23

8        C.    The Claims Are Indefinite for Reciting Both an Apparatus and a Method .......... 25

   V.    CONCLUSION ............................................................................................. 25
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdou v. Alphatec Spine, Inc.*,
   No. 12-cv-1804, 2014 WL 6611422 (S.D. Cal. Nov. 19, 2014)......................................24, 25

*Abraxis Bioscience, Inc. v. Navinta LLC*,
   625 F.3d 1359 (Fed. Cir. 2010)...........................................................................................7, 10

*Alps South, LLC v. Ohio Willow Wood Co.*,
   787 F.3d 1379 (Fed. Cir. 2015)..................................................................................................21

*Alzheimer's Inst. of Am., Inc. v. Elan Pharms., Inc.*,
   No. C-10-482, 2012 WL 12920745 (N.D. Cal. Aug. 3, 2012)...................................................7

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
   876 F.3d 1350 (Fed. Cir. 2017).................................................................................................22

*Bank of Am., NA v. First Am. Title Ins. Co.*,
   499 Mich. 74 (2016)...................................................................................................................13

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys.*,
   563 U.S. 776 (2011).....................................................................................................................8

*Bell Semiconductor LLC v. NXP USA, Inc.*,
   No. 8:22-cv-2113, 2023 WL 7459264 (C.D. Cal. Oct. 16, 2023)............................................24

*Blockchain Innovation, LLC v. Franklin Res., Inc.*,
   No. 21-cv-8787, 2025 WL 672941 (N.D. Cal. Mar. 3, 2025).................................................17

*CAO Lighting, Inc. v. Gen. Elec. Co.*,
   No. 20-cv-681, 2023 WL 387585 (D. Del. Jan. 25, 2023).......................................................22

*cf. Sentius Int'l, LLC v. Microsoft Corp.*,
   78 F. Supp. 3d 967 (N.D. Cal. 2015).........................................................................................22

*Cooper v. Prime Image, Inc.*,
   No. 97-21050, 1999 U.S. Dist. LEXIS 14898 (N.D. Cal. May 14, 1999)..................................8

*Cygnus Telecomms. Tech., LLC v. Am. Int'l Telephonics, LLC*,
   569 F. Supp. 2d 1035 (N.D. Cal. 2008).......................................................................................8

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005).................................................................................................23

*Dematic Corp. v. UAW*,
   635 F. Supp. 2d 662 (W.D. Mich. 2009)...................................................................................13

*F.T.C. v. Publ'g Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997), *as amended* (Apr. 11, 1997)................................. 14

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
No. 13-cv-3999, 2015 WL 3640694 (N.D. Cal. June 11, 2015)................................ 10, 11, 16

*Ghalehtak v. Fay Servicing, LLC*,
304 F. Supp. 3d 877 (N.D. Cal. 2018) .................................................................. 7

*H.R. Techs., Inc. v. Astechnologies, Inc.*,
275 F.3d 1378 (Fed. Cir. 2002)............................................................................ 21

*Horizon Props., L.L.C. v. Downriver Cmty. Conf.*,
No. 278260, 2008 WL 4274408 (Mich. Ct. App. Sept. 18, 2008)................................ 12, 13

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
850 F.3d 1315 (Fed. Cir. 2017)............................................................................ 20

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)............................................................................ 23

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)............................................................................ 1, 23, 25

*Jean Jacques Darmon, Inc. v. State Farm Gen. Ins. Co.*,
No. 21-cv-5235, 2023 WL 9019042 (C.D. Cal. Nov. 14, 2023)................................ 10

*Kamilche Co. v. United States*,
53 F.3d 1059 (9th Cir. 1995)................................................................................ 7

*Kellogg Co. v. Sablok*,
471 F.3d 629 (6th Cir. 2006)................................................................................ 18

*Klapp v. United Ins. Grp. Agency, Inc.*,
468 Mich. 459 (2003)............................................................................................ 13

*Koss Corp. v. Bose Corp.*,
107 F.4th 1363 (Fed. Cir. 2024)............................................................................ 6

*Lee v. Retail Store Emp. Bldg. Corp.*,
No. 15-cv-4768, 2017 WL 6387771 (N.D. Cal. Dec. 14, 2017)................................ 10, 17

*Lucasarts Ent. Co. v. Humongous Ent. Co.*,
815 F. Supp. 332 (N.D. Cal. 1993) ...................................................................... 17

*MONEC Holding AG v. Motorola Mobility, Inc.*,
897 F. Supp. 2d 225 (D. Del. 2012)...................................................................... 22

*Mont. v. United States*,
440 U.S. 147 (1979)................................................................................................ 6

*Navarro v. United States Dep't of Homeland Sec.*,
   612 F. Supp. 3d 986 (N.D. Cal. 2020) ................................................................. 16

*In re Neurografix ('360) Pat. Litig.*,
   201 F. Supp. 3d 206 (D. Mass. 2016) ................................................................. 25

*Phigenix, Inc. v. Immunogen, Inc.*,
   845 F.3d 1168 (Fed. Cir. 2017) ........................................................................... 16

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004) ............................................................................. 9

*SecurityPoint Holdings, Inc. v. United States*,
   138 Fed. Cl. 101 (2018) ...................................................................................... 15

*Shower Enclosures Am., Inc. v. BBC Distribution Corp.*,
   No. 15-cv-627, 2016 WL 3031081 (N.D. Ind. May 27, 2016) ............................ 15

*Skilstaf, Inc. v. CVS Caremark Corp.*,
   669 F.3d 1005 (9th. Cir. 2012) ..................................................................... 6, 7, 8

*Sonos, Inc. v. Google LLC*,
   591 F. Supp. 3d 638 (N.D. Cal. 2022) ................................................................. 22

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*,
   778 F.3d 1311 (Fed. Cir. 2015) ............................................................................. 6

*Speedplay, Inc. v. Bebop, Inc.*,
   211 F.3d 1245 (Fed. Cir. 2000) ............................................................................. 8

*Uniloc USA Inc. v. Motorola Mobility LLC*,
   52 F.4th 1340 (Fed. Cir.2022) ............................................................................... 8

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) .............................................................................. 16

*VLSI Tech. LLC v. Intel Corp.*,
   706 F. Supp. 3d 953 (N.D. Cal. 2023) ............................................................ 21, 23

*Winbond Elecs. Corp. v. ITC*,
   262 F.3d 1363 (Fed. Cir. 2001) ........................................................................... 20

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
   No. 17-cv-3848, 2018 WL 2585436 (N.D. Cal. May 8, 2018) .............................. 7

**Statutes**

35 U.S.C. § 100(d) ...................................................................................................... 21

35 U.S.C. § 281 .......................................................................................................... 21

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3    As the Western District of Michigan has already determined that the lone plaintiff UUSI

4    lacks Article III standing to enforce the sole asserted '183 patent, issue preclusion compels

5    summary judgment.  In *UUSI v. Samsung*, Judge Maloney found that UUSI never owned any

6    interest in the '183 patent.  That final judgment precludes UUSI from relitigating the identical

7    ownership issue here.  The undisputed facts establish that all elements of issue preclusion are met:

8    1.  **Identical issue**.  Both *Samsung* and this case involve the identical issue of whether
         UUSI owned the '183 patent at the time suit was filed.

9
10   2.  **Final judgment on the merits.**  The *Samsung* court entered final judgment against
         UUSI for lack of Article III standing to assert the '183 patent.

11   3.  **Same party.**  UUSI is the sole plaintiff in both actions.

12   Even apart from issue preclusion, the assignment history confirms that UUSI never

13   acquired any interest in the '183 patent from any of the three named inventors.  Those interests

14   remain with either UUSI's president, Norman Rautiola, or with Nartron Corporation.  UUSI's

15   shifting and contradictory ownership theories—many raised after fact discovery close—cannot

16   bridge the gaps in its chain of title.  Because UUSI has never held any ownership interest, it lacks

17   both Article III and statutory standing.  Summary judgment should be entered for Apple.

18   Additionally, Apple had no pre-suit knowledge of the reexamined '183 patent or its new

19   claims.  Apple thus lacks knowledge of either the patent or infringement for indirect or willful

20   infringement.  The parties' pre-suit communications about the original patent are insufficient.

21   Finally, claims 37-39 of the '183 patent are invalid as indefinite.  The undisputed evidence

22   shows that "closely spaced" lacks objective boundaries, even under UUSI's construction, and the

23   asserted claims contain a hybrid apparatus/method claim that is impermissible under *IPXL*.

24   **II.    APPLE IS ENTITLED TO SUMMARY JUDGMENT OF NO ARTICLE III OR
             STATUTORY STANDING**

25   **A.    Statement of Facts**

26   **1.    Plaintiff UUSI and Its President Mr. Rautiola.**

27   UUSI is a Michigan limited liability company and the sole plaintiff in this action.  (ECF

28   No. 1, ¶ 1.)  Its President, Mr. Rautiola, formed the company in December 2008 under its initial

1    name "Usi Nartron, LLC." (Ex. 1, 8:15-17; Ex. 2.)

2         Mr. Rautiola also owns and controls Nartron Corporation ("Nartron Corp."), a company

3    he founded in May 1968. (Ex. 3.) Over the years, Nartron Corp. has undergone several legal

4    name changes, including a change to "Oldnar Corporation" in March 2010. (*Id.*) Despite this

5    change, the company has continued to operate and litigate as "Nartron Corp.," and Mr. Rautiola

6    has routinely executed documents on its behalf under that name. (*See, e.g.*, Exs. 5-6.) Neither

7    Mr. Rautiola nor Nartron Corp. is a party to this lawsuit.

### 2.    Litigations Involving the '183 Patent.

9         **_Samsung_ litigation.** On February 13, 2015, UUSI sued Samsung Electronics Co., Ltd.

10   and a related U.S. entity (collectively, "Samsung") in the Western District of Michigan for

11   allegedly infringing the '183 Patent. (ECF No., 142-1, 1-2.) After fact discovery close, Samsung

12   moved to dismiss for lack of Article III standing, and briefing on that motion was complete by

13   August 15, 2024. (*Id.*) On March 14, 2025, the court granted Samsung's motion, finding UUSI

14   lacked Article III standing to assert the '183 patent. (*Id.* at 12.) It entered judgment dismissing

15   all claims against Samsung. (ECF No. 142-2.) UUSI appealed to the Federal Circuit on April 9,

16   2025, and the appellate court docketed the appeal (No. 2025-1640) the following day.

17        **_Apple_ litigation.** On November 22, 2017, UUSI sued Apple for alleged infringement of

18   the same '183 patent. (ECF No. 1.) Apple moved to dismiss for lack of Article III standing on

19   October 3, 2024. (ECF No. 128.) On November 7, 2024, the Court heard Apple's motion. (ECF

20   No133.) At the hearing, UUSI acknowledged that Samsung's then-pending standing motion in

21   Michigan involved the "same ownership issue" and would "answer the ownership question in"

22   this case. (ECF No. 139, 4:13-5:12.) Finding it "inefficient" for "two district judges in two

23   different districts deciding the very same question," the Court terminated Apple's motion without

24   prejudice but allowed Apple to renew its standing challenge in a summary judgment motion after

25   the *Samsung* court had "reached [its] decision." (*Id.* at 5:13-6:4.)

### 3.    The '183 Patent and Its Named Inventors.

27        The '183 patent relates to a capacitive electronic switching circuit. (ECF No. 1-1,

28   Abstract.) It was filed in 1996, issued in 1998, and expired nine years ago in 2016. The '183

1  patent has three named inventors:  Byron Hourmand, the only named inventor when the patent

2  issued, and John Washeleski and Stephen Cooper, who were added later as co-inventors.[1]  Each

3  co-inventor had a pro rata undivided interest in the entire patent.  Through various assignments,

4  each co-inventor's original interest in the patent now belongs to Mr. Rautiola or Nartron Corp.

5          **Hourmand interest.**  When the '183 patent issued in 1998, Mr. Hourmand was the only

6  named inventor.  On January 31, 1996, he assigned his interest in the '183 patent to Nartron Corp.

7  (Ex. 8).  On October 30, 2008, Nartron Corp. assigned its interest to Mr. Rautiola in his individual

8  capacity.  (Ex. 9).  Mr. Rautiola has held Mr. Hourmand's interest in the '183 patent since.

9          **Washeleski & Cooper interests.**  Fourteen years after the filing of the application for the

10  '183 patent, UUSI and Nartron Corp. sued Mr. Hourmand to add Mr. Washeleski and Dr. Cooper

11  as co-inventors.  (Ex. 4.)  Lacking resources to litigate, Mr. Hourmand consented to a judgment

12  adding Mr. Washeleski and Dr. Cooper as co-inventors.  (Ex. 5; Ex. 17, 107:10-20, 111:6-15,

13  22:5-22.)  A certificate of correction later issued, adding both.  (ECF No. 1-1, 34.)  On April 14,

14  2010, Mr. Washeleski and Dr. Cooper assigned their ownership interests in the '183 patent to

15  Nartron Corp.  (Ex. 10.)  Nartron Corp. has held their original interests ever since.

16                    **4.       UUSI's Shifting Standing Theories.**

17          Throughout this litigation, UUSI has repeatedly altered its standing theory.

18                         **a.       Original theory**

19          Through the close of fact discovery, UUSI maintained the position in its August 1, 2024

20  interrogatory response on the assignment history of the '183 patent.  Specifically, it asserted:

21          **Hourmand interest.**  On January 31, 1996, Mr. Hourmand assigned his interest in the

22  patent to Nartron Corp., which then assigned it to UUSI on December 17, 2009.  (Ex. 11, 3-4.)

23          **Washeleski & Cooper interests.**  On April 14, 2010, Mr. Washeleski and Dr. Cooper

24  assigned their interests in the patent to Nartron Corp.  (*Id.*)

25          Apple deposed Mr. Rautiola, who was UUSI's corporate designee on patent assignment.

26  (*See* Ex. 1.)  Mr. Rautiola did not identify any agreements supporting UUSI's ownership.

27

28  [1] Apple disputes the '183 patent's inventorship.  For this motion, however, Apple accepts UUSI's
representation that Mr. Hourmand, Mr. Washeleski, and Dr. Cooper are co-inventors.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b.      Second set of theories (October 2024)

Fact discovery closed on September 19, 2024.  On October 3, 2024, Apple moved to dismiss this case for lack of standing.  (ECF No. 128.)  In its October 17 opposition, UUSI abandoned its original theory and advanced entirely new ones.  (ECF No. 130.)

**Hourmand interest.**  UUSI's new theories disclaimed reliance on the December 17, 2009 agreement.  Instead, UUSI asserted that Mr. Hourmand assigned his interest to Nartron Corp. on January 31, 1996.  Nartron Corp. then allegedly assigned that interest to Mr. Rautiola on October 30, 2008.  (*Id.* at 9.)  Finally, UUSI alleged that Mr. Rautiola assigned his interest to UUSI (then named "Usi Nartron, LLC") on December 12, 2018.  (*Id.*)  UUSI also newly relied on a previously unproduced November 28, 2008 agreement.  (ECF No. 132, 2 n.3.)

**Washeleski & Cooper interests.**  UUSI continued to rely on the April 14, 2010 assignments.  (ECF No. 130 at 10.)  It newly argued, however, that the assignments "mistakenly" identified Nartron Corp. as the assignee but were actually intended for UUSI.  (*Id.*)

**Alternative theory for Washeleski interest.**  UUSI also advanced an alternative for Mr. Washeleski's interest based on his 1985 and 1992 employment agreements.  (*Id.*)  Per UUSI, the 2011 correction of inventorship adding him as an inventor applied retroactively to the patent's issuance.  (*Id.*)  UUSI further argued that, under his employment agreements, this retroactive addition meant his interest was automatically assigned to Nartron Corp. when the patent issued in 1998.  (*Id.*)  UUSI therefore deduced that his interest followed the same path as Mr. Hourmand's: from Nartron Corp. to Mr. Rautiola in October 2008, and then to UUSI in December 2008.  (*Id.*)

Over a month after fact discovery closed, on October 24, 2024, UUSI supplemented its interrogatory response to incorporate these new theories.  (Ex. 21, 6-7.)

### c.      Third set of theories (May 2025)

On May 5, 2025, after the *Samsung* court ruled that UUSI lacked Article III standing to assert the '183 patent, UUSI sought leave here to address that decision.  (ECF No. 155.)  Its proposed briefing again raised new standing theories.  (ECF No. 155-1.)

**Hourmand interest.**  Although UUSI still rely on the same set of agreements, its arguments have changed.  UUSI now asserts that Nartron Corp. transferred ***no*** assets to

1    Mr. Rautiola on December 12, 2018, contradicting its prior claim that Nartron Corp. transferred

2    "all of its remaining assets" to him that day.  (*Compare* ECF No. 155-1, 2 *with* ECF No. 130, 6.)

3        **Washeleski & Cooper interests.**  UUSI also no longer relies on the April 14, 2010

4    assignments.  It now asserts that those agreements conveyed *no* interest in the '183 patent.  (ECF

5    No. 155-1, 3.)  UUSI's latest theories rely on (1) two employment agreements for Mr. Washeleski

6    and (2) three previously unproduced employment agreements for Dr. Cooper.  (*Id.*)

7        Departing from its prior position that the correction of inventorship applied retroactively

8    to the '183 patent's 1998 issuance, UUSI now contends that the correction took effect when the

9    certificate of correction issued on October 11, 2011.  (*Compare* ECF No. 130, 10 *with* ECF No.

10   155-1, 4.)  Under this theory, Mr. Washeleski's and Dr. Cooper's interests vested on that date and

11   automatically transferred to Nartron Corp. under their employment agreements.  (ECF No. 155-1,

12   4.)  UUSI asserts that, on either November 28 or December 12, 2008, Nartron Corp. transferred

13   those (then future) interests to Mr. Rautiola, who transferred them to UUSI.  (*Id.*)

14       On June 4, 2025, the Court denied UUSI's request to file additional briefing to address the

15   *Samsung* court's standing decision.  (ECF No. 169.)

16           **5.    Summary of Agreements**

17       UUSI has introduced numerous agreements in support of its shifting standing theories.

18   Apple summarizes both the relevant and irrelevant agreements below for the Court's reference:

19   •    **1984, 1989, and 1992 (Cooper employment agreements):**  Dr. Cooper assigns to
          Nartron Corp. all rights in inventions conceived during his employment.  (ECF Nos.
20        155-4 to 155-6.)  UUSI introduced these agreements seven months after discovery
          closed.

21   •    **1985 and 1992 (Washeleski employment agreements):**  Mr. Washeleski assigns to
          Nartron Corp. all rights in inventions conceived during his employment.  (Ex. 22.)
22
     •    **January 31, 1996:**  Mr. Hourmand assigns his patent interest to Nartron Corp.  (Ex.
23        8.)

24   •    **October 30, 2008:**  Nartron Corp. assigns its patent interest to Mr. Rautiola.  (Ex. 9.)
          Per Mr. Rautiola, Nartron Corp. made this assignment after it defaulted on a loan that
25        he provided following its bankruptcy.  (ECF No. 130-1, ¶¶12-13.)

26   •    **November 28, 2008 (1st agreement):**  Nartron Corp. assigns "all of [its] right . . . to
          all of its assets and property" to Mr. Rautiola.  (ECF No. 130-11.)  This agreement
27        does not involve the '183 patent, as Nartron Corp. had already assigned that interest to
          Mr. Rautiola.  UUSI did not produce this agreement during fact discovery.

28   •    **November 28, 2008 (2nd agreement):**  Mr. Rautiola assigns "all of the assets and
          property of Nartron Corporation (the 'Assets') under a certain Assignment Agreement

dated 11-28-2008" to UUSI's predecessor, Usi Nartron. (Ex. 23.) This agreement does not involve the '183 patent, because the "Assets" transferred under the first November 28, 2008 agreement did not include the '183 patent.

- **December 12, 2008 (1st agreement):** Nartron Corp. assigns "all of [its] right . . . to all of its assets and property" to Mr. Rautiola. (Ex. 13.) This agreement does not involve the '183 patent, as Nartron Corp. had already assigned it to Mr. Rautiola.

- **December 12, 2008 (2nd agreement):** Mr. Rautiola assigns "all of the assets and property of Nartron Corporation (the 'Assets') under a certain Assignment Agreement dated Dec 12 2008" to UUSI's predecessor, Usi Nartron. (Ex. 14.) Per Mr. Rautiola, he intended to transfer Nartron Corp.'s former assets to Usi Nartron. (ECF No. 130-1, ¶20.) This agreement does not involve the '183 patent, because the "Assets" transferred under the first December 12, 2008 agreement did not include the patent.

- **December 17, 2009 agreement:** Nartron Corp. purportedly assigns the '183 patent and other patents to UUSI. (Ex. 12.) UUSI now concedes that this agreement did not assign any interests in the '183 patent to UUSI. (*See* ECF No. 130, 6-7.)

- **April 14, 2010 Agreements**: Mr. Washeleski and Dr. Cooper each assign their interest in the '183 patent to "Nartron Corporation." (Ex. 10.)

As the preceding makes clear, the assignment history has two gaps. ***First***, after acquiring Mr. Hourmand's interest on October 30, 2008, Mr. Rautiola never assigned that interest to UUSI. The November and December 2008 agreements transferred only Nartron Corp.'s then-held assets, which no longer included Mr. Hourmand's interest in the '183 patent. ***Second***, Mr. Washeleski's and Dr. Cooper's interests in the '183 patent have never been assigned to UUSI.

### B.    UUSI Lacks Article III Standing to Assert the '183 Patent.

#### 1.    Issue preclusion bars UUSI from asserting the '183 patent.

Collateral estoppel, or issue preclusion, prevents a party from relitigating issues that were fully and fairly litigated in a previous action. *See Mont. v. United States*, 440 U.S. 147, 153-54 (1979). The Federal Circuit "appl[ies] the law of the regional circuit to the general procedural question of whether issue preclusion applies" and its own law to questions of issue preclusion that "implicate substantive patent law issues." *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015). Regardless, the Federal Circuit and the Ninth Circuit apply the same test for finding issue preclusion:

1) the identical issue was necessarily decided in the prior proceeding;

2) the prior proceeding ended with a final judgment on the merits; and

3) the party to be estopped was a party (or in privity with a party) in the prior proceeding.

*See Koss Corp. v. Bose Corp.*, 107 F.4th 1363, 1366 n.3 (Fed. Cir. 2024); *Skilstaf, Inc. v. CVS*

1    *Caremark Corp.*, 669 F.3d 1005, 1021 (9th. Cir. 2012) (test for issue preclusion).

2          Here, the dispositive facts are straightforward and undisputed. The '183 patent is the sole

3    asserted patent in this case and *Samsung*. In *Samsung*, the court found after full briefing and a

4    hearing that UUSI "did not have any interest" in the '183 patent and thus lacked Article III

5    standing. (ECF No. 142-1.) The court subsequently entered judgment against UUSI. (ECF No.

6    142-2.) UUSI has conceded that *Samsung* involved the "same ownership issue" on the "same

7    patent" and agreed that its ruling would "answer the ownership issue in this case as well." (ECF

8    No. 139, 4:19-5:12, 8:11-13.) These undisputed facts satisfy each element of issue preclusion:

9          **Identical issue.** *Samsung* and this case concern the same question: whether UUSI had

10    any ownership interest in the '183 patent at the time it filed suit. UUSI concedes as much. (*Id.*)

11          UUSI cannot avoid preclusion by raising new arguments or evidence now. "[O]nce an

12    *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular

13    arguments raised in support of it." *Kamilche Co. v. United States*, 53 F.3d 1059, 1063 (9th Cir.

14    1995) (emphasis in original). A party cannot escape preclusion "by simply offering facts and

15    arguments it could have presented in an earlier case but chose not to." *XpertUniverse, Inc. v.*

16    *Cisco Sys., Inc.*, No. 17-cv-3848, 2018 WL 2585436, at *4 (N.D. Cal. May 8, 2018).

17          Here, the relevant timeframe for assessing Article III standing is the filing of the lawsuits

18    against Apple and Samsung eight years ago. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625

19    F.3d 1359, 1363-64 (Fed. Cir. 2010) (Article III standing must exist when a suit is filed). There is

20    no reason UUSI could not have raised all its standing theories and evidence in the *Samsung* case.

21          Because the *Samsung* court's judgment rested on its determination that UUSI lacked

22    Article III standing, it "necessarily decided" the identical issue presented here. *Skilstaf*, 669 F.3d

23    at 1021; *see also Alzheimer's Inst. of Am., Inc. v. Elan Pharms., Inc.*, No. C-10-482, 2012 WL

24    12920745, at *1 (N.D. Cal. Aug. 3, 2012) (finding no standing based on issue preclusion where

25    plaintiff "was fully heard and lost on the necessary and identical issue of standing").

26          **Final judgment on the merits.** The *Samsung* court's determination that UUSI lacked

27    standing, followed by entry of judgment against it, constitutes "a final judgment on the merits."

28    ECF No. 142-2; *Skilstaf*, 669 F.3d at 1021; *Ghalehtak v. Fay Servicing, LLC*, 304 F. Supp. 3d

877, 885 (N.D. Cal. 2018) (no standing became "final" "resolution on the merits" when court "entered judgment"). UUSI's pending appeal does not prevent preclusion. *Uniloc USA Inc. v. Motorola Mobility LLC*, 52 F.4th 1340, 1348 (Fed. Cir.2022) ("[C]ollateral estoppel can be applied based on a district court decision that is still pending on appeal."); *Cygnus Telecomms. Tech., LLC v. Am. Int'l Telephonics, LLC*, 569 F. Supp. 2d 1035, 1037-38 (N.D. Cal. 2008).

**Same party.** There is no dispute that UUSI, against whom preclusion is asserted, was a party in *Samsung*. *Skilstaf*, 669 F.3d at 1021.

After giving UUSI a full and fair opportunity to present its positions, the *Samsung* court found that UUSI lacked Article III standing to assert the '183 patent. That issue cannot be relitigated here. *See Cooper v. Prime Image, Inc.*, No. 97-21050, 1999 U.S. Dist. LEXIS 14898, at *1-2 (N.D. Cal. May 14, 1999) (issue preclusion bars relitigating standing). Summary judgment of no standing is thus proper.

### 2. UUSI has never owned the '183 patent.

#### a. UUSI never acquired any named inventor's original interest.

Apart from issue preclusion, as Apple raised in its motion to dismiss, UUSI lacks Article III standing because the assignment records show that it has never held any ownership interest in the '183 patent. To establish ownership, UUSI "must produce a written instrument documenting the transfer of proprietary rights in the patent[]." *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000). This requires an unbroken chain of title from at least one named inventor to UUSI. *See Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 563 U.S. 776, 786 (2011). The record shows that none of the named inventors' interests ever reached UUSI: the chain ends with Mr. Rautiola and Nartron Corp.—not UUSI—as owners of the patent.



1  **Hourmand interest**.  The chain of title does not convey Mr. Hourmand's interest to

2  UUSI.  Instead, Mr. Rautiola owns that interest as a result of the following assignments:

3  - **January 31, 1996 assignment:**  Mr. Hourmand assigned his interest in the '183 patent to Nartron Corp (Ex. 8);

4

5  - **October 30, 2008 assignment:**  Nartron Corp. assigned Mr. Hourmand's original interest to Mr. Rautiola in his individual capacity via a notarized agreement (Ex. 9).

6  Neither Mr. Rautiola nor UUSI deny the October 2008 assignment's existence.  When deposed,

7  Mr. Rautiola described the '183 patent as "one of [his] most valuable" assets—even making sure

8  that the October 2008 assignment was notarized.  (Ex. 1, 147:12-16, 146:14-16.)  UUSI also

9  admitted that "Nartron Corporation assigned its entire interest in the '183 patent originally

10  belonging to Mr. Byron Hourmand to Mr. Rautiola on October 30, 2008."  (Ex. 19 at 5.)  Mr.

11  Hourmand's original interest remains with Mr. Rautiola.

12  **Washeleski & Cooper interests.**  On April 14, 2010, the two later-added co-inventors

13  Mr. Washeleski and Dr. Cooper each assigned their interests in the '183 patent to Nartron Corp.

14  (Ex. 10.)  UUSI concedes that Nartron Corp.—an entity distinct from UUSI—owns those

15  interests.  (Ex. 11, 3-4 (identifying only the April 2010 assignments for Mr. Washeleski's and Dr.

16  Cooper's interests); Ex. 19, 8 ("Nartron Corporation (now named Oldnar Corporation) and

17  Plaintiff UUSI, LLC are two separate legal entities.").)  As UUSI never acquired any inventor's

18  interest, it has no ownership interest in the patent.  UUSI thus lacks Article III standing to assert

19  the patent, and summary judgment is proper.

20  None of UUSI's shifting standing theories cures this fatal defect.  The deliberate corporate

21  transfers surrounding Nartron Corp.'s bankruptcy may have served other purposes, but they did

22  not convey the '183 patent to UUSI.  Having chosen that structure, UUSI cannot avoid its

23  consequences.  As the Federal Circuit has explained, companies "may not enjoy the advantages of

24  their separate corporate structure and, at the same time, avoid the consequential limitations of that

25  structure."  *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004).

26  **b.    UUSI lacks standing under its original theory.**

27  As an initial matter, UUSI must be held to the standing theory it disclosed before the close

28  of fact discovery.  "[P]rejudice is 'inherent in the assertion of a new theory after discovery has

closed.'" *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-cv-3999, 2015 WL 3640694, at *2 (N.D. Cal. June 11, 2015); *see also Jean Jacques Darmon, Inc. v. State Farm Gen. Ins. Co.*, No. 21-cv-5235, 2023 WL 9019042, at *7 (C.D. Cal. Nov. 14, 2023) (barring theory contradicting prior interrogatory response).  Nor may UUSI rely on evidence it did not produce during fact discovery.  *Lee v. Retail Store Emp. Bldg. Corp.*, No. 15-cv-4768, 2017 WL 6387771, at *11 (N.D. Cal. Dec. 14, 2017) (precluding new evidence produced after fact discovery close).  The record is clear that UUSI's original theory fails to establish Article III standing.

**Hourmand interest.**  UUSI's original theory claimed that Mr. Hourmand assigned his interest in the '183 patent to Nartron Corp. on January 31, 1996, and Nartron Corp. conveyed that interest to UUSI on December 17, 2009.  (Ex. 11, 3-4.)  But the December 2009 assignment could not have transferred Mr. Hourmand's interest because Nartron Corp. no longer owned it.  Over a year earlier, on October 30, 2008, Nartron Corp. had assigned its entire interest in the '183 patent to Mr. Rautiola.  At that point, Nartron had "no authority to convey either the patent['s] equitable or legal titles to [UUSI]."  *Abraxis*, 625 F.3d at 1367.  The December 2009 assignment was thus "ineffective, because the assignor, [Nartron Corp.], did not own the patent[] at the time."  *Id.*  Mr. Hourmand's interest remains with Mr. Rautiola—who is not a plaintiff in this case.



**Washeleski & Cooper interests.**  Up until the fact discovery close, UUSI maintained that Nartron Corp.—not UUSI—owned Mr. Washeleski's and Dr. Cooper's interests in the '183 patent.  (Ex. 11, 3-4.)  UUSI's admission that it never acquired Mr. Washeleski's and Dr. Cooper's interests, along with Mr. Rautiola's retention of Mr. Hourmand's interest, means UUSI holds no original interest from any named inventor.  Thus, UUSI lacks standing.

        c.         **UUSI lacks standing under its second set of theories.**

Only *after* fact discovery closed and *after* Apple moved to dismiss for lack of standing did

1  UUSI abandon its prior position and advance an entirely new, second set of theories on standing.

2  (ECF No. 130.)  But a party may not cure a standing defect by introducing new theories after the

3  close of fact discovery.  *See Finjan v. Blue Coat*, 2015 WL 3640694, at *2.

4      Even setting this procedural bar aside, UUSI's second set of theories necessarily fail on

5  the merits, as the *Samsung* court correctly determined.  (*See* ECF No. 142-2.)

6                    **(i)      UUSI does not hold Mr. Hourmand's interest.**

7      UUSI's second set of theories disclaimed the December 17, 2009 agreement on which it

8  had originally relied and advanced a new sequence of assignments.  (ECF No. 130, 6.)  Per UUSI:

- **January 31, 1996:**  Mr. Hourmand assigns his '183 patent interest to Nartron Corp.
- **October 30, 2008:**  Nartron Corp. assigns its '183 patent interest to Mr. Rautiola.
- **1st November 28, 2008 agreement:**  Nartron Corp. allegedly "assign[s] all of its remaining assets to Mr. Rautiola."
- **2nd November 28, 2008 agreement:**  Mr. Rautiola allegedly assign[s] "all of the assets and property" he had been assigned from Nartron Corp. to UUSI's predecessor, Usi Nartron, LLC.
- **1st December 12, 2008 agreement:**  Nartron Corp. allegedly "assign[s] all of its remaining assets," e.g., "bank account interest" and "cash in accounts receivable," to Mr. Rautiola.
- **2nd December 12, 2008 agreement:**  Mr. Rautiola allegedly assign[s] to UUSI's predecessor, Usi Nartron, all of Nartron Corp.'s "former assets held during October through December 2008" on the very day Usi Nartron was formed.  (*Id.* at 6, 14, 15.)

17     Under its revised theories, UUSI contends that the second December 12, 2008 agreement

18  assigned the '183 patent to Usi Nartron.  (*Id.*)  This argument fails for multiple reasons.

19                    **(1)      The plain language forecloses UUSI's reading.**

20     The second December 12, 2008 agreement assigned "all of the assets and property of

21  Nartron Corporation *(the 'Assets') under a certain Assignment Agreement dated Dec 12 2008*"

22  to UUSI's predecessor, Usi Nartron.  (Ex. 14 (emphasis added).)  The referenced "Assignment

23  Agreement dated Dec 12 2008" is the first December 12, 2008 assignment from Nartron Corp. to

24  Mr. Rautiola.  It is undisputed that this first assignment did not encompass the '183 patent.  By

25  that time, Nartron Corp. no longer owned the '183 patent; it had already assigned its '183 patent

26  rights to Mr. Rautiola two months earlier, via the October 30, 2008 agreement.

27     Because the "Assets" referenced in the second December 12, 2008 agreement are defined

28  as the "assets and property" transferred under the first December 12, 2008 assignment—and those

"Assets" did not include the '183 patent—the second December 12, 2008 agreement could not have conveyed any interest in that patent.  Mr. Hourmand's interest remains with Mr. Rautiola.



**(2)   UUSI ignores contract interpretation rules.**

To bring the '183 patent within the scope of the second December 12, 2008 agreement, UUSI's second set of theories contends that the transferred "Assets" include those assigned to Mr. Rautiola via the October 30, 2008 and November 28, 2008 agreements.  (ECF No. 130, 10-15.) But this reading violates settled Michigan contract principles, which govern the agreements.

Under Michigan law, a contract must be read as a whole, harmonizing all provisions and giving effect to every word.  *See Horizon Props., L.L.C. v. Downriver Cmty. Conf.*, No. 278260, 2008 WL 4274408, at *4 (Mich. Ct. App. Sept. 18, 2008).  Clear and unambiguous language cannot be rewritten "under the guise of interpretation."  *Id.* at *2.

Here, the second December 12, 2008 agreement assigned Mr. Rautiola's rights in certain "Assets" to Usi Nartron:  ***Mr. Rautiola "hereby assigns, conveys, transfers and sets over to [Usi Nartron] any and all of [Mr. Rautiola's] right, title and interest in and to the Assets."***  (Ex. 14 (emphasis added).)  The "Assets" are defined as those under a specific "Assignment Agreement dated Dec 12 2008": "***all of the assets and property of Nartron Corporation (the 'Assets') under a certain Assignment Agreement dated Dec 12 2008.***"  (*Id.* (emphasis added).)

UUSI's position—that this agreement conveyed not only the assets under the first December 12, 2008 agreement, but also those transferred via the October 30, 2008 and November 28, 2008 agreements—impermissibly adds and deletes words from the agreement.  (ECF No. 130, 10-15.)  The second December 12, 2008 agreement refers to neither the October 30, 2008 nor November 28, 2008 assignment to Mr. Rautiola.  Expanding its scope to include them would rewrite the contract, which Michigan law forbids.  *See Horizon,* 2008 WL 4274408, at *4.

Indeed, the parties' choice to reference only an "Assignment Agreement dated

1    Dec[ember] 12[,] 2008," while omitting the October 30, 2008 transfer of the '183 patent,

2    confirms they did not intend the second December 12, 2008 agreement to encompass that patent.

3    *See Bank of Am., NA v. First Am. Title Ins. Co.*, 499 Mich. 74, 85-86 (2016) (determining parties'

4    intent by interpreting contract's language per its plain and ordinary meaning).

5          UUSI's argument also is improper because it would nullify the phrase "under a certain

6    Assignment Agreement dated Dec[ember] 12[,] 2008."  If, as UUSI contended, the second

7    December 12, 2008 agreement also included all prior asset transfers from Nartron Corp. to Mr.

8    Rautiola, that phrase would be superfluous.  *See Horizon,* 2008 WL 4274408, at *4 (discouraging

9    interpretation that would "eliminate" language); *Klapp v. United Ins. Grp. Agency, Inc.*, 468

10   Mich. 459, 468 (2003) ("[C]ourts must also give effect to every word, phrase, and clause in a

11   contract and avoid an interpretation that would render any part of the contract surplusage[.]").

12                    **(3)      The extrinsic evidence does not help UUSI.**

13         UUSI's purported extrinsic evidence does not cure its standing defect.  UUSI's opposition

14   relies on a declaration from Mr. Rautiola executed sixteen years ***after*** the second December 12,

15   2008 agreement and a month ***after*** fact discovery close.  In his belated declaration, Mr. Rautiola

16   claims that he *really* intended to assign to UUSI all former assets held by Nartron Corp. "as of

17   October through December 2008," including the '183 patent.  (ECF No. 130-1, ¶ 22.)

18         That declaration fails to support UUSI's standing for multiple reasons.

19         ***First***, "[e]xtrinsic evidence [of intent] may only be considered if the contract is

20   ambiguous."  *See Dematic Corp. v. UAW*, 635 F. Supp. 2d 662, 672 (W.D. Mich. 2009).  The

21   second December 12, 2008 agreement unambiguously defines the assigned "Assets" as those

22   transferred under the first December 12, 2008 agreement—which undisputedly did not include the

23   '183 patent.  As the agreement is clear, Mr. Rautiola's post hoc interpretation is irrelevant.

24         ***Second***, Mr. Rautiola's declaration is unreliable and inadmissible.  It is nearly identical to

25   a declaration he submitted in *Samsung* on August 15, 2024.  (*Compare* ECF No. 130-1 *with* Ex.

26   16.)  When deposed, however, Mr. Rautiola testified he did not recognize the *Samsung*

27   declaration, admitted his lawyers wrote it, and could not recall events he recounted in detail in his

28   declaration.  (Ex. 1, 138:10-149:14, 150:19-151:11, 173:15-174:19; *compare* Ex. 16, ¶18 *with* Ex.

1, 165:6-24.)  Mr. Rautiola's deposition testimony thus confirms that his declaration is "conclusory, self-serving," "lack[s] . . . any supporting evidence," and should be disregarded.  *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997) (unreliable declaration insufficient to create a genuine issue of material fact).

**Finally**, even if the Court were to consider extrinsic evidence, it confirms that the '183 patent was not transferred to UUSI via the second December 12, 2008 agreement.  UUSI's own conduct makes this clear.  A year later on December 17, 2009, Nartron Corp. executed a new assignment to UUSI that purported to transfer the '183 patent and dozens of other patents.  (Ex. 12.)  UUSI recorded this agreement with the U.S. Patent Office on December 22, 2009.[2]  (Ex. 6, ¶ 2.)  Had UUSI already acquired Mr. Hourmand's interest under the second December 12, 2008 agreement as it now claims, this later assignment and recordation would have been unnecessary.

UUSI's prior litigation and Patent Office statements confirm this understanding.  When suing Mr. Hourmand on July 10, 2010, UUSI alleged that Nartron Corp. assigned the '183 patent to it "on December 17, 2009." (Ex. 4, ¶ 13.)  Mr. Rautiola repeated this in an August 2011 sworn declaration to the Patent Office.  (Ex. 6, ¶ 2.)  Although UUSI has since disclaimed those statements, they contradict its theory that it acquired Mr. Hourmand's interest in 2008.

### (ii)    UUSI Does Not Hold Mr. Washeleski's Interest.

With respect to Mr. Washeleski's original interest in the '183 patent, UUSI's second set of theories propose two paths for its acquisition of that interest.  Neither establishes standing.

**First route.**  The first path depends on Mr. Washeleski's 1985 and 1992 employment agreements.  (ECF No. 130, 7.)  Per UUSI, under both employment agreements, Mr. Washeleski assigned to Nartron Corp. his entire interest in all inventions conceived during his employment at Nartron Corp.  (*Id.*; Ex. 22.)  UUSI argued that the 2011 correction of inventorship adding Mr. Washeleski applied retroactively to the 1998 issuance of the '183 patent, meaning his interest automatically transferred to Nartron Corp. in 1998.  (ECF No. 130, 7 and 10.)  UUSI also asserted that Mr. Washeleski's interest followed the same path as Mr. Hourmand's: from Nartron Corp. to Mr. Rautiola on October 30, 2008, and ultimately to UUSI on December 12, 2008.  (*Id.*)

---

[2] As noted, UUSI concedes that this assignment was ineffective.

1    This path thus fails for the same reason as UUSI's theories for Mr. Hourmand's interest:

2    Mr. Rautiola never assigned the '183 patent after October 30, 2008.  Under this path, Mr.

3    Washeleski's interest still resides with Mr. Rautiola.

4    **Second route.**  UUSI's second set of theories alternatively points to the April 14, 2010

5    assignment identified in its discovery response, but newly claims that its express assignment of

6    Mr. Washeleski's interest to Nartron Corp. was a "clerical error."  (*Id.* at 8, 15-16.)  Per UUSI,

7    because Nartron Corp. had changed its name to "Oldnar Corporation," the real intended assignee

8    was UUSI, which allegedly was doing business as "Nartron."  (*Id.* at 16.)

9    This theory is contrary to the agreement's plain language and contemporaneous evidence.

10   The April 14, 2010 agreement explicitly assigned Mr. Washeleski's interest to "**Nartron**

11   **Corporation**."  (Ex. 10 (emphasis in original).)  This was no typographical error.  Courts

12   recognize "clerical errors" only in cases involving mistaken assignments to similarly named

13   entities that did not exist.  *See, e.g.*, *Shower Enclosures Am., Inc. v. BBC Distribution Corp.*, No.

14   15-cv-627, 2016 WL 3031081, at *1 (N.D. Ind. May 27, 2016) (mistaken assignment to "Shower

15   Enclosures, Inc." instead of "Shower Enclosures America, Inc."); *SecurityPoint Holdings, Inc. v.*

16   *United States*, 138 Fed. Cl. 101, 103-04 (2018) (mistaken assignment to "Security Point Media,

17   Inc." instead of "SecurityPoint Media, LLC").  Here, "UUSI, LLC" bears no resemblance to

18   "Nartron Corporation," which separately ***did*** exist.

19   The April 14, 2010 assignment to Nartron Corp. (not UUSI) thus was intentional and not a

20   "clerical error."  The relevant parties' contemporaneous conduct confirms this:

21   - **Hourmand lawsuit:**  After the April 14, 2010 assignment, Nartron Corp. and UUSI
     jointly sued Mr. Hourmand on July 20, 2010, alleging that "Mr. Washeleski and Dr.
22   Cooper [had] assigned to Nartron [defined as ***Nartron Corporation***] their rights as
     joint inventors of the '183 patent."  (Ex. 4, ¶¶ 1, 55 (emphasis added).)

23   - **Hourmand consent judgment:**  In an August 2010 consent judgment, UUSI and
     Nartron Corp. likewise reiterated that "John M. Washeleski and Stephen R.W. Cooper
24   ha[d] assigned their interests as inventors of the '183 patent to plaintiff ***Nartron***
     ***Corporation***."  (Ex. 5, ¶ 7 (emphasis added).)
25
     - **Patent Office statement:**  Finally, on August 11, 2011, Mr. Rautiola represented to
26   the U.S. Patent Office that Nartron Corp.—not UUSI—was the "assignee of the joint
     inventors of" the '183 patent.  (Ex. 6, ¶ 1.)

27   UUSI's purported extrinsic evidence again lends no aid.  UUSI newly pointed to a

28   declaration from Rob Tuttle, who prepared the April 14, 2010 agreements.  (ECF Nos. 130-22,

130 at 15-18.)  Like Mr. Rautiola's declaration, Mr. Tuttle's is unreliable.  Mr. Tuttle openly

admits that he lacks "a clear recollection of the events" relating to the April 14, 2010

assignments.  (ECF No. 130-22, at 1.)  He further concedes uncertainty as to whether the intended

assignee was UUSI or Nartron Corp.  Although Mr. Tuttle nevertheless states he is "certain" that

"'Nartron' was to be the assignee of the Washeleski and Cooper interests," he simultaneously

concedes that he "*may* have known that Nartron was a business name of 'UUSI.'"  (*Id.* (emphasis

added).)  Such equivocal testimony cannot support standing.  *See Villiarimo v. Aloha Island Air,*

*Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (disregarding "uncorroborated" declaration

beyond personal knowledge); *Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1173-74 (Fed.

Cir. 2017) (no standing where declaration included no admissible facts).

     In sum, neither route conveyed Mr. Washeleski's interest to UUSI.  Under the first route,

his interest never left Mr. Rautiola.  Under the second, it transferred to Nartron Corp, not UUSI.

### (iii)    UUSI Does Not Hold Dr. Cooper's Interest.

     UUSI newly contended that Dr. Cooper's interest follows its proposed second route for

Mr. Washeleski's interest.  (ECF No. 130, 8.)  That path fails for the same reason:  Dr. Cooper,

like Mr. Washeleski, assigned his interest to Nartron Corp., not UUSI.

     Thus, even if the Court were to consider UUSI's second set of theories, they still fail.

### d.    UUSI lacks standing under its latest theories.

     UUSI's final set of theories—raised over seven months after fact discovery close and six

months after its opposition to Apple's standing motion—still do not avoid summary judgment.

     As a procedural matter, the Court should not consider them.  UUSI raised its latest

theories in a proposed brief attached to its administrative motion for leave to address the *Samsung*

standing decision.  (ECF Nos. 155, 155-1.)  The Court denied that motion. (ECF No. 169.)  UUSI

cannot reargue these belated and already rejected positions.  *See also Finjan*, 2015 WL 3640694,

at *4 (precluding new theory [] "identified for the first time after the close of fact discovery");

*Navarro v. United States Dep't of Homeland Sec.*, 612 F. Supp. 3d 986, 1002 (N.D. Cal. 2020)

(rejecting "new arguments that could and should have been raised in [] original papers").  The

Court also should disregard UUSI's newest theory for Dr. Cooper's interest because it relies

1    entirely on employment agreements from the 1980s and 1990s that UUSI **never produced** before

2    the fact discovery cutoff.  (ECF Nos. 155-4 to 155-6.)  There is no reason why UUSI could not

3    have produced those decades-old agreements earlier.  *See Lee v. Retail Store*, 2017 WL 6387771,

4    at *11 (precluding new evidence produced after fact discovery close).

5         Even if considered, as explained below, UUSI's latest set of theories still fail.

6                    **(i)      UUSI does not hold Mr. Hourmand's interest.**

7         UUSI's latest arguments for Mr. Hourmand's interest contradict its prior position.  While

8    still relying on the same sequence of assignments identified in its opposition, UUSI now offers

9    two new interpretations of the second December 12, 2008 agreement to support its claim that this

10   agreement transferred Mr. Hourmand's interest in the '183 patent to UUSI.  (ECF No. 155-1, 13.)

11        ***First,*** apparently recognizing that the second December 12, 2008 agreement nowhere

12   references the October 30 transfer of the '183 patent to Mr. Rautiola, UUSI now contends that

13   under this agreement, Mr. Rautiola transferred all assets of Nartron Corp. that he held, "regardless

14   of when [he] acquired those assets."  (*Id.* at 1-2.)  But this contradicts UUSI's prior opposition to

15   Apple's standing motion and Mr. Rautiola's sworn testimony.

16        In its prior opposition, UUSI argued that the second December 12, 2008 agreement

17   transferred only "all of Nartron Corporation's former assets **held during October through**

18   **December 2008**."  (ECF No. 130, 14 (emphasis added).)  Mr. Rautiola likewise declared that the

19   agreement transferred only those assets formerly held by Nartron Corp. "in October through

20   December 2008."  (ECF No. 130-1, ¶ 20.)  UUSI's new interpretation, which "flatly contradicts"

21   both its earlier position and its witness's sworn testimony, should be rejected.  *See Blockchain*

22   *Innovation, LLC v. Franklin Res., Inc.*, No. 21-cv-8787, 2025 WL 672941, at *4 (N.D. Cal. Mar.

23   3, 2025); *Lucasarts Ent. Co. v. Humongous Ent. Co.*, 815 F. Supp. 332, 336 (N.D. Cal. 1993)

24   (rejecting argument "directly contradicted by the declaration of" one's witness).

25        UUSI's new reading also belies common sense.  If the second December 12, 2008

26   agreement truly encompassed ***all*** assets Mr. Rautiola had ever received from Nartron Corp., it

27   would cover decades of salary, stock, and other personal property accumulated during his forty-

28   plus years as Nartron Corp.'s president.  That is an absurd result that no contracting party could

1  have intended.  *Kellogg Co. v. Sabhlok*, 471 F.3d 629, 636 (6th Cir. 2006) ("[C]ontracts must be

2  construed consistent with common sense and in a manner that avoids absurd results.").

3      ***Second,*** to bolster its claim that the second December 12, 2008 agreement swept in all

4  former assets of Nartron Corp., including the '183 patent, UUSI argues that the first December

5  12, 2008 assignment conveyed no assets because the November 28, 2008 agreement had already

6  transferred all of Nartron Corp.'s assets to Mr. Rautiola.  (ECF No. 155-1, 2.)  Based on that

7  premise, UUSI contends the second December 12, 2008 agreement could not have been limited to

8  the assets conveyed under the first December 12, 2008 agreement, but must have included all

9  former Nartron Corp. assets.  (*Id.*)  Otherwise, per UUSI, it would lead to the "nonsensical" result

10  that the second December 12, 2008 agreement conveyed no assets at all.  (*Id.*)

11      This argument again contradicts UUSI's earlier position.  In its prior opposition to

12  Apple's standing motion, UUSI acknowledged that Nartron Corp. could have acquired additional

13  assets (e.g., "bank account interest" and "cash in accounts receivable") even after the November

14  28, 2008 assignment.  Nartron Corp. then could have transferred those newly acquired assets to

15  Mr. Rautiola under the first December 12, 2008 agreement.  (ECF No. 130, 6.)  Indeed, UUSI

16  expressly asserted that the first December 12, 2008 agreement "assigned all of [Nartron Corp.'s]

17  ***remaining*** assets to Mr. Rautiola," and Mr. Rautiola's declaration stated the same.  (*Id.*; ECF No.

18  130-1, ¶ 20.)  UUSI's latest theory that the first December 12, 2008 agreement conveyed *no*

19  assets is irreconcilable with these prior statements.

20      Even if one credits UUSI's new position that the first December 12, 2008 agreement

21  conveyed no assets, it still does not follow that the second December 12, 2008 agreement

22  transferred the '183 patent to UUSI.  UUSI's reasoning is simply that it would be "nonsensical"

23  for the second December 12, 2008 agreement to convey nothing.  (ECF No. 155-1, 2.)  But UUSI

24  simultaneously argues that the first December 12, 2008 agreement—executed on the same day—

25  conveyed nothing.  If the parties were willing to execute one agreement that conveyed no assets,

26  there is nothing "nonsensical" about them executing a second agreement doing the same.

27      **(ii)      UUSI does not hold Mr. Washeleski's or Dr. Cooper's
             interests.**

28

1    UUSI has completely overhauled its theories for Mr. Washeleski's and Dr. Cooper's

2    interests.  UUSI previously argued that both interests vested on August 18, 1998, when the '183

3    patent issued, because the correction of inventorship applied retroactively.  (ECF No. 130, 7-8.)

4    It now takes the opposite position, claiming that their interests did not vest until October 11,

5    2011, when the certificate of correction issued.  (ECF No. 155-1, 4.)  UUSI also has abandoned

6    the "two routes" it previously advanced in its opposition for Mr. Washeleski's interest.  It further

7    disclaims the April 14, 2010 assignments by Mr. Washeleski and Dr. Cooper, now contending

8    that neither conveyed any interest in the '183 patent.  (ECF No. 155-1, 3-4.)

9    Under its latest theories, UUSI claims ownership of Mr. Washeleski's and Dr. Cooper's

10    interests through the following chain of events (ECF No. 155-1, 3-5):

- **Mr. Washeleski's & Dr. Cooper's employment agreements:**  In the 1980s and 1990s, Mr. Washeleski and Dr. Cooper allegedly assigned to Nartron Corp. all rights in inventions conceived during their employment.
- **1st November 28, 2008 or 1st December 12, 2008 agreement:**  Under either agreement, Nartron Corp. allegedly transferred the not-yet-vested interests of Mr. Washeleski and Dr. Cooper in the '183 patent to Mr. Rautiola.
- **2nd November 28, 2008 or 2nd December 12, 2008 agreement:**  Under either agreement, Mr. Rautiola then allegedly transferred those future interests to UUSI.
- **Certificate of correction.**  Upon issuance on October 11, 2011, Mr. Washeleski's and Dr. Cooper's interests allegedly vested and automatically passed to UUSI.

17    UUSI's newest theories fail for multiple reasons.  *First*, they contradict UUSI's prior

18    briefing and witness testimony.  UUSI previously argued that the April 14, 2010 agreements *did*

19    transfer Mr. Washeleski's and Dr. Cooper's interests.  (ECF No. 130, 8.)  Messrs. Rautiola and

20    Tuttle submitted declarations to that effect.  (ECF Nos. 130-1 ¶ 29; 130-22 ¶ 3.)  UUSI also

21    previously maintained that these interests vested in 1998, not 2011.  (ECF No. 130, 7-8.)

22    *Second*, as with UUSI's theories for Mr. Hourmand's interest, there is a fatal gap in the

23    chain of title.  By October 30, 2008, Nartron Corp. had already assigned the '183 patent interest

24    to Mr. Rautiola.  As a result, neither the first November 28, 2008 assignment nor the first

25    December 12, 2008 assignment by Nartron Corp. encompassed the '183 patent.  It follows that

26    neither the second November 28, 2008 agreement nor the second December 12, 2008 agreement

27    could have conveyed any '183 patent interest to UUSI.

28

**Finally**, UUSI's attempt to avoid this gap by recasting the October 30, 2008 assignment fails. UUSI newly argues that this assignment could not have conveyed Mr. Washeleski's and Dr. Cooper's interests in the '183 patent because (1) their interests had not yet vested, and (2) the agreement conveyed only existing interests. (ECF No. 155-1, 4-5.) Both premises are wrong.

UUSI's first premise that Mr. Washeleski's and Dr. Cooper's interests had not yet vested in 2008 is legally wrong. As UUSI previously acknowledged, a correction of inventorship applies retroactively to the patent's issuance date. (ECF No. 130, 10 (citing *Roche Palo Alto LLC v. Ranbaxy Lab'ys Ltd.*, 551 F. Supp. 2d 349, 359 (D.N.J. 2008)); *Winbond Elecs. Corp. v. ITC*, 262 F.3d 1363, 1373 (Fed. Cir. 2001) (applying correction of inventorship retroactively and allowing enforcement against past infringer). Accordingly, Mr. Washeleski's and Dr. Cooper's interests vested in 1998, were automatically assigned to Nartron Corp. under their employment agreements, and passed to Mr. Rautiola via the October 30, 2008 agreement. Under UUSI's newly asserted sequence, those interests end with Mr. Rautiola—not UUSI.

UUSI's second premise fails because the October 30, 2008 agreement conveyed both existing and future rights. UUSI's attempt to distinguish that agreement from the November 28 and December 12, 2008 agreements is arbitrary. (ECF No. 155-1, 5.) There is no reason that those later agreements could convey future rights but the October 30, 2008 agreement could not.

UUSI points to language in the later agreements covering all "right, title and interest in and to *all [] assets and property of every kind and nature, real, intangible and mixed*." (*Id.* (emphasis in original).) But the October 30, 2008 agreement contains equally broad terms, assigning "the entire right, title, and interest in and to" the '183 patent and "to any inventions disclosed therein." (Ex. 10.) That language encompasses both existing and future rights. *See Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1323 (Fed. Cir. 2017) (assignment

1  of rights to an "invention" includes future rights).  Because the October 30, 2008 agreement

2  transferred to Mr. Rautiola all rights in the '183 patent, whether existing or future,

3  Mr. Washeleski's and Dr. Cooper's interests necessarily end with Mr. Rautiola, not UUSI.

4      **C.      UUSI Lacks Statutory Standing to Assert the '183 Patent**

5          To sue for patent infringement, a plaintiff must not only have Article III standing, but also

6  statutory standing under 35 U.S.C. § 281.  *See Alps South, LLC v. Ohio Willow Wood Co.*, 787

7  F.3d 1379, 1382 (Fed. Cir. 2015).  § 281 confers statutory standing only on a "patentee," defined

8  as the original patentee (*i.e.*, the party to whom the patent issued) or its successors in title.  35

9  U.S.C. § 100(d); *H.R. Techs., Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1384 (Fed. Cir. 2002).

10         Because UUSI has never held legal title to the '183 patent, it is not a "patentee."  The

11 Court also should grant summary judgment for lack of statutory standing.

12 **III.    APPLE IS ENTITLED TO SUMMARY JUDGMENT OF NO WILLFUL
13         INFRINGEMENT AND NO INDIRECT INFRINGEMENT**

14     **A.      Factual Background**

15         UUSI's sole pre-suit contact with Apple regarding the '183 patent was its outreach in

16 2007, in which UUSI alleged that Apple's iPod dials infringed claims 1, 21 and 27 of the *pre-*

17 *examination* '183 patent—claims that are unasserted.  (*See* Exs. 24-29.)  The parties exchanged

18 letters, with Apple explaining why the iPod dials did not infringe and why the '183 patent was

19 invalid.  (*Id.*)  UUSI never responded to Apple's final letter, dated December 12, 2007.  (Ex. 29.)

20         On August 17, 2012, UUSI requested *ex parte* reexamination of the '183 patent.  (Ex. 30.)

21 On April 29, 2013, an *ex parte* reexamination certificate issued, including new claims 37-39, the

22 only claims currently asserted.  (Ex. 31 at UUSI_000330-32.)  Although UUSI and Nartron also

23 had a 2015 discussion concerning "anti-pinch" technology, patents were not discussed.  (Ex. 32.)

24     **B.      Apple Lacked the Requisite Knowledge**

25         UUSI cannot prove either indirect or willful infringement because "both require proof, for

26 each asserted patent, that the defendant knew or should have known (1) of the patent, and (2) that

27 it was infringing the patent."  *VLSI Tech. LLC v. Intel Corp.*, 706 F. Supp. 3d 953, 991 (N.D. Cal.

28 2023) (citing *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015) (for indirect

1    infringement); *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed.

2    Cir. 2017) (for willful infringement); *Sonos, Inc. v. Google LLC*, 591 F. Supp. 3d 638, 647 (N.D.

3    Cal. 2022) ("Like willful infringement, both forms of indirect infringement — induced and

4    contributory infringement — require knowledge of the patent and knowledge of infringement.")).

5         UUSI has offered no facts that show that Apple had knowledge of the asserted '183

6    patent, let alone knowledge of the alleged infringement of the '183 patent.  Rather, UUSI has

7    argued that the parties' 2007 communications regarding the ***pre-reexamination*** patent suffice to

8    show both knowledge of the reexamined patent and of infringement.  (*See* ECF No. 1 ¶¶ 24-25;

9    Ex. 33 at 3, 5 (no identification of post-reexam knowledge); Ex. 34 at 15-16 (identifying only

10   documents from 2007).)  Knowledge of an ***original*** patent, however, is not equivalent to

11   knowledge of a ***reexamined*** patent.  *See MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F.

12   Supp. 2d 225, 232 (D. Del. 2012) (dismissing indirect infringement claims and noting plaintiff

13   "cites no authority indicating that actual knowledge of an original patent is equivalent to actual

14   knowledge of a reexamined patent, and the relevant case law suggests that drawing such an

15   inference is too tenuous *even at the pleading stage*") (emphasis added); *see also CAO Lighting,*

16   *Inc. v. Gen. Elec. Co.*, No. 20-cv-681, 2023 WL 387585, at *2 (D. Del. Jan. 25, 2023) (finding

17   willfulness claim inadequate as it did not "plausibly allege the defendants knew or should have

18   known they infringed the patent as it existed after the reexamination or why the patent changed");

19   *cf. Sentius Int'l, LLC v. Microsoft Corp.*, 78 F. Supp. 3d 967, 975 (N.D. Cal. 2015) (granting

20   summary judgment of no induced and no willful infringement; explaining defendant's knowledge

21   of reissued patent's predecessor was insufficient to show knowledge of reissued patent).

22        Nor does the parties' 2015 discussion concerning "anti-pinch" technology establish the

23   prerequisite pre-suit knowledge.  UUSI did not even rely on it in its Complaint or infringement

24   contentions or disclose it in response to Apple's Interrogatory No. 17 concerning pre-suit

25   communications.  (ECF No. 1; Exs. 33-34.)  Further, Apple's corporate witness testified that the

26   parties never discussed the '183 patent (or any patent) as part of those communications.  (Ex. 32.)

27        As UUSI's evidence does not create a genuine dispute of material fact as to whether

28   Apple had pre-suit knowledge of either the patent or of infringement, UUSI "cannot prove pre-

suit willful or indirect infringement." *VLSI*, 706 F. Supp. 3d at 995 (granting summary judgment of no willful and no indirect infringement).

## IV.    APPLE IS ENTITLED TO SUMMARY JUDGMENT THAT THE '183 PATENT IS INVALID FOR INDEFINITENESS

### A.    Procedural Background

The parties previously briefed whether the term "closely spaced"—which appears in all three asserted claims—was indefinite.  (*See* ECF Nos. 108 at 9-11, 109 at 7-9, and 111 at 4-6.) They also briefed whether the claims were indefinite under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005).  (*See* ECF Nos. 108 at 13-14, 109 at 13-14, and 111 at 8-9.)  During the claim construction hearing, the Court indicated that it would decide the indefiniteness issues on summary judgment.  (Ex. 150-1 at 18:25-19:7, 31:22-25.)

### B.    "Closely Spaced" Is Indefinite

The Court should find that the term "closely spaced" in the phrase "closely spaced array of input touch terminals" is indefinite.  Because it is recited in every asserted claim, the Court should grant summary judgment of invalidity on claims 37-39.

As UUSI concedes, "closely spaced" is "a term of degree."  (ECF No. 108 at 10.)  "[A] term of degree fails to provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'"  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (cleaned up).  "When a word of degree is used[,] the district court must determine whether the patent's specification provides some standard for measuring that degree."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005).

The full record confirms that the term "closely spaced" "provides little guidance to one of skill in the art."  *Interval*, 766 F.3d at 1371; *see also* Ex. 35 ¶ 533 (Apple expert Paul Dietz opining that "closely spaced" has "no specialized or technical meaning to a POSITA").  The specification uses the term "closely spaced" only once.  (Ex. 31, 18:66-19:6 ("the reduction in crosstalk afforded by the present invention allows the touch terminals in the array to be more closely spaced together").)  It does not provide "objective boundaries" for how "closely spaced" the touch terminals must be.  *See Interval*, 766 F.3d at 1371; *see also* Ex. 35 ¶ 534.

As Apple's expert Dr. Dietz, explains, "the closeness of the input touch terminals will

1    depend on the frequency chosen and the likelihood of surface contamination." (*Id.* ¶ 535 (quoting

2    Ex. 31, 11:30-33 ("[T]he frequency chosen will be a tradeoff between the likelihood of surface

3    contamination and the cost of going to higher frequencies to prevent cross talk due to such

4    contamination[.]")).) And "the cost sensitivity of the manufacturer is not something that a

5    POSITA would be aware of and is entirely subjective." (*Id.* ¶ 536.) "[The likelihood of surface

6    contamination depends on the types of contaminants (e.g., tap water, salt water, or oils) and the

7    actions of the user who is using the keypad, which a POSITA has no means of knowing in

8    advance." (*Id.*) This is precisely "the unrestrained, subjective opinion of a particular individual

9    purportedly practicing the invention" that renders the claim term indefinite. *Bell Semiconductor*

10   *LLC v. NXP USA, Inc.*, No. 8:22-cv-2113, 2023 WL 7459264, at *25 (C.D. Cal. Oct. 16, 2023).

11   UUSI's construction "does nothing to alleviate the subjectivity of the term." (Ex. 35 ¶

12   539.) Per UUSI and its expert, Dr. Cairns, "the claimed 'closely spaced array' means that the

13   touch terminals are placed sufficiently close to one another that the presence of surface

14   contamination can cause cross-talk or inadvertent actuation." (Ex. 36 ¶ 204; *see id.* ¶¶ 202-203

15   (quoting specification without analysis). But there is no objective boundary at which "the

16   presence of surface contamination can cause cross-talk or inadvertent actuation" or becomes "a

17   problem." (*Contra* Ex. 36 ¶ 204; *see* Ex. 35 ¶ 537.) Rather, that boundary "depends on

18   frequencies employed and the amount and types of potential contaminants . . . there is no *a priori*

19   way for a POSITA to know contamination (in the abstract) will cause cross-talk." (Ex. 35 ¶ 539.)

20   This has real-world consequences. Imagine a manufacturer designing a device with an

21   "array of input touch terminals." It wants to design around the '183 patent by ensuring that the

22   terminals are not "closely spaced." Per UUSI and Dr. Cairns, all the manufacturer needs to do is

23   to ensure that "surface contamination" is not "a problem." (Ex. 36 ¶ 204.) But as Dr. Dietz

24   explained and Dr. Cairns does not dispute, whether such a "problem" exists depends on how the

25   users use the accused devices: Do they walk with their devices in the rain? Do they set them

26   down by the salty surf as their kids build sandcastles? Do they drop them in tonight's olive oil

27   marinade? (*See* Ex. 35 ¶ 536.) The manufacturer cannot know, and neither does a POSITA.

28   In *Abdou v. Alphatec Spine, Inc.*, the court found the term "in proximity to" indefinite, as

"neither 'in proximity' nor any other language in the specification otherwise defines what the proximity would be in any specific way."  No. 12-cv-1804, 2014 WL 6611422, at *9 (S.D. Cal. Nov. 19, 2014).  So too, the *In re Neurografix ('360) Pat. Litig.* court found the term "near" indefinite, as it "signifie[d] physical proximity," but nothing in the patent "shed[] light on the limits of proximity required by the 'near' term."  201 F. Supp. 3d 206, 222, 223 (D. Mass. 2016). In doing so, the *Neurografix* court rejected plaintiff's expert opinion that the "components to be '"near" enough' to accomplish the functional goals stated in the claim" because, as defendant's expert opined, "nothing in the patent explains which of the potentially many possible configurations would achieve the stated goals of the invention."  *Id.* at 223.  The Court should likewise find that "closely spaced" is indefinite because it lacks objective boundaries.

**C.    The Claims Are Indefinite for Reciting Both an Apparatus and a Method**

Independent claim 37 recites both (1) an apparatus ("a microcontroller using the periodic output signal from the oscillator") and (2) a method of use of that apparatus ("the microcontroller selectively providing signal output frequencies").  *See IPXL*, 430 F.3d at 1384.  It is thus unclear whether infringement occurs (1) when one creates the apparatus that allows the microcontroller to selectively provide signal output frequencies or (2) when the microcontroller actually selectively provides signal output frequencies.  *IPXL*, 430 F.3d at 1384 (finding term indefinite as it was "unclear whether infringement of the claim occurred upon creation of the system or upon the use of the system"); *see also* Ex. 35 ¶ 530.  In prior briefing, UUSI's proposed construction did not "limit *when* the selection occurs, or *who or what* performs it" (ECF No. 111 at 3 (emphasis in original)—showing that the claim recites a method, not a mere "capability of the apparatus."  (Ex. 35 ¶ 531.)  The Court therefore should find it (and all dependent claims) indefinite on this basis.

**V.    CONCLUSION**

As the *Samsung* court has already held, UUSI never owned any interest in the sole asserted '183 patent.  It thus lacks Article III and statutory standing to bring this action.  Apple also has neither indirectly nor willfully infringed the '183 patent.  Finally, claims 37-39 are indefinite because "closely spaced" lacks reasonably certain scope and they contain hybrid claims.  For all these reasons, Apple urges the Court to grant summary judgment in its favor.

1    Dated:  August 25, 2025                    MORRISON & FOERSTER LLP

2
                                               By:  /s/ Bita Rahebi
3                                                   BITA RAHEBI

4                                                  *Attorneys for Defendant*
                                                   APPLE INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28