1  LAWRENCE M. HADLEY - State Bar No. 157728
   lhadley@glaserweil.com
2  STEPHEN UNDERWOOD – State Bar No. 320303
   sunderwood@glaserweil.com
3  LARA A. PETERSEN - State Bar No. 318475
   lpetersen@glaserweil.com
4  GLASER WEIL FINK HOWARD
     JORDAN & SHAPIRO LLP
5  10250 Constellation Boulevard, 19th Floor
   Los Angeles, California 90067
6  Telephone:  (310) 553-3000
   Facsimile:  (310) 556-2920
7
   Attorneys for Plaintiff
8  UUSI, LLC

9                 UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12

13  UUSI, LLC, D/B/A NARTRON,              Case No.: 3:18-cv-04637-JD

14            Plaintiff,                   Hon. James Donato

15       v.                               **PLAINTIFF UUSI, LLC'S OPPOSITION TO
                                           APPLE INC.'S MOTION FOR SUMMARY
16  APPLE INC.,                            JUDGMENT**

17            Defendant.                   Hearing Date:   October 2, 2025
                                           Hearing Time:   10:00 am
18                                         Courtroom:      11

19                                         Action Filed:   November 22, 2017
                                           Trial Date:     January 26, 2026
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................................... 1

II.     UUSI OWNS THE '183 PATENT AND HAS STANDING TO FILE SUIT ................... 1

   A.    Patent Ownership Factual Background .................................................. 1

      1.    The Evolution of Nartron ............................................................ 1

      2.    The '183 Patent and Inventorship Correction ............................. 2

      3.    Assignment History ..................................................................... 3

         a.    The Hourmand Interest ........................................................ 3

         b.    The Washeleski and Cooper Interests ................................. 4

   B.    Nartron Is Not Barred from Asserting Ownership by Issue Preclusion ................. 6

   C.    UUSI Owns the '183 Patent ..................................................................... 8

      1.    The Assignments Transferred the Hourmand Interest to UUSI ............... 10

      2.    UUSI Owns the Washeleski and Cooper Interests ..................................... 12

         a.    Mr. Washeleski and Dr. Cooper Automatically Assigned Their
               Interests to UUSI Via Their Employment Agreements ................. 12

         b.    Mr. Washeleski and Dr. Cooper Conveyed Their Interests to
               UUSI a Second Time in Separate 2010 Assignments ................... 13

   D.    UUSI Has Statutory Standing ................................................................ 17

III.    APPLE IS NOT ENTITLED TO SUMMARY JUDGMENT ON WILLFUL OR
        INDIRECT INFRINGEMENT ....................................................................... 17

   A.    Apple Had Actual Knowledge of the '183 Patent Before UUSI Filed Suit .......... 17

   B.    There Is Sufficient Evidence Apple Had Pre-Suit Knowledge of Infringement ... 21

IV.     THE '183 PATENT IS NOT INDEFINITE ....................................................... 22

   A.    Apple Fails to Show that "Closely Spaced" is Indefinite ........................ 22

   B.    The Claims Are Not Indefinite Under IPXL ........................................... 24

V.      CONCLUSION ............................................................................................. 25

UUSI, LLC'S OPPOSITION TO APPLE INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:18-cv-04637-JD

1

## **TABLE OF AUTHORITIES**

2

Page

3

## **FEDERAL CASES**

4    *Abbott Lab'ys v. Andrx Pharms., Inc.*,
       473 F.3d 1196 (Fed. Cir. 2007) ............................................................................. 7

5

6    *Advanced Video Techs. LLC v. HTC Corp.*,
       879 F.3d 1314 (Fed. Cir. 2018) ........................................................................... 13

7    *Andrew Corp. v. Gabriel Elecs., Inc.*,
       847 F.2d 819 (Fed. Cir. 1988) ............................................................................. 22

8

9    *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*,
       288 F. App'x 697 (Fed. Cir. 2008) ...................................................................... 17

10   *BGT Holdings LLC v. United States*,
       984 F.3d 1003 (Fed. Cir. 2020) ........................................................................... 12

11

12   *CAO Lighting, Inc. v. Feit Electric Company, Inc.*,
       2020 WL 7786580 (C.D. Cal. 2020) ............................................................... 20, 21

13   *CAO Lighting, Inc. v. Gen. Elec. Co.*,
       No. CV 20-681-GBW, 2023 WL 387585 (D. Del. Jan. 25, 2023) ............................ 19, 20

14

15   *Clewett v. New Wave Power, LLC*,
       No. 3:21-CV-0692-S, 2023 WL 5986472 (N.D. Tex. Sept. 13, 2023) .......................... 10

16   *Copperhead Indus. Inc. v. G.E. Schmidt, Inc.*,
       No. 1:17-CV-609, 2018 WL 2412339 (S.D. Ohio May 29, 2018) ............................. 14

17

18   *Core Optical Techs., LLC v. Nokia Corp.*,
       102 F.4th 1267 (Fed. Cir. 2024) .......................................................................... 16

19   *Dow Chem. Co. & Subsidiaries v. United States*,
       278 F. Supp. 2d 844 (E.D. Mich. 2003) ................................................................ 9

20

21   *Dow Chem. Co. v. United States*,
       435 F.3d 594 (6th Cir. 2006) ................................................................................ 9

22   *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
       879 F.3d 1332 (Fed. Cir. 2018) ............................................................................ 22

23

24   *Ferguson v. Neighborhood Hous. Servs., Inc.*,
       780 F.2d 549 (6th Cir. 1986) ................................................................................ 16

25   *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*,
       701 F.3d 1093 (6th Cir. 2012) ............................................................................... 8

26

27   *Hiser v. Franklin*,
       94 F.3d 1287 (9th Cir. 1996) ................................................................................ 7

28   *HTC Corp. v. IPCom GmbH & Co., KG*,
       667 F.3d 1270 (Fed. Cir. 2012) ................... (3) ................................................... 25

*Imperium (IP) Holdings, Inc. v. Apple Inc.*,
   No. 4:11-CV-163, 2012 WL 2995997 (E.D. Tex. June 4, 2012) ....................................... 17

*Intell. Tech LLC v. Zebra Techs. Corp.*,
   101 F.4th 807 (Fed. Cir. 2024) ................................................................................... 15

*IPXL Holdings v. Amazon.com*,
   430 F.3d 1377 (Fed. Cir. 2005) ............................................................................. 24, 25

*Lawson v. Spirit AeroSystems, Inc.*,
   61 F.4th 758 (10th Cir. 2023) ..................................................................................... 10

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
   925 F.3d 1225 (Fed. Cir. 2019) ................................................................................... 17

*Love v. Villacana*,
   73 F.4th 751 (9th Cir. 2023) ......................................................................................... 8

*Martinez v. Dep't of Homeland Sec.*,
   410 F.3d 1366 (Fed. Cir. 2005) ................................................................................... 10

*MasterMine Software, Inc. v. Microsoft Corp.*,
   874 F.3d 1307 (Fed. Cir. 2017), ............................................................................. 24, 25

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
   520 F.3d 1367 (Fed. Cir. 2008), ................................................................................. 25

*MONEC Holding AG v. Motorola Mobility, Inc.*,
   897 F. Supp. 2d 225 (D. Del. 2012), ..................................................................... 19, 20

*Montana v. United States*,
   440 U.S. 147 (1979). ............................................................................................. 8, 20

*Nartron Corp. and UUSI, LLC v. Hourmand*,
   No. 1:10-cv-00691-RHB (W.D. Mich.) .......................................................................... 3

*Novacor Chemicals, Inc. v. United States*,
   171 F.3d 1376 (Fed. Cir. 1999) ................................................................................... 10

*Pac. Gas & Elec. Co. v. United States*,
   536 F.3d 1282 (Fed. Cir. 2008) ................................................................................... 12

*Penda Corp. v. U.S.*,
   29 Fed. Cl. 533 (1993) ............................................................................................... 23

*Preston v. Marathon Oil Co.*,
   684 F.3d 1276 (Fed. Cir. 2012) ................................................................................... 12

*Robi v. Five Platters, Inc.*,
   838 F.2d 318 (9th Cir. 1988) ......................................................................................... 7

*Rosemount, Inc. v. Beckman Instruments, Inc.*,
   727 F.2d 1540 (Fed. Cir. 1984) ................................................................................... 22

(4)

*Saghian v. Shemuelian*,
   835 F. App'x 351 (10th Cir. 2020) ................................................................. 16

*Santos v. Farmers Ins. Exch.*,
   No. 07-11229, 2008 WL 2937776 (E.D. Mich. July 24, 2008) ............................ 7

*Sell Below Cost USA LLC v. Blue Island Holding Grp. (US) Inc.*,
   No. 19CV6095KAMRER, 2021 WL 1394284 (E.D.N.Y. Feb. 9, 2021) ............... 16

*Sentius Int'l, LLC v. Microsoft Corp.*,
   78 F. Supp. 3d 967 (N.D. Cal. 2015) .............................................................. 20

*Shower Enclosures Am., Inc. v. BBC Distribution Corp.*,
   No. 3:15CV627, 2016 WL 3031081 (N.D. Ind. May 27, 2016) ......................... 15

*Simulation Sys. Inc. v. Autodesk, Inc.*,
   50 F.4th 1358 (Fed. Cir. 2022) ...................................................................... 22

*Speedplay, Inc. v. Bebop, Inc.*,
   211 F.3d 1245 (Fed. Cir. 2000) ...................................................................... 12

*Stark v. Budwarker, Inc.*,
   25 Mich. App. 305 (1970) .............................................................................. 9

*UltimatePointer, L.L.C. v. Nintendo Co.*,
   816 F.3d 816 (Fed. Cir. 2016) ................................................................. 24, 25

*VLSI Tech. LLC v. Intel Corp.*,
   706 F. Supp. 3d 953 (N.D. Cal. 2023) ...................................................... 17, 21

*Wexler v. Dep't of Interior*,
   909 F.2d 1496 (Fed. Cir. 1990) ...................................................................... 11

## **FEDERAL STATUTES**

28 U.S.C. § 1295(a)(4) ......................................................................................... 8

35 U.S.C. § 141(c) ............................................................................................... 8

35 U.S.C. § 251 ................................................................................................. 18

35 U.S.C. § 281 ................................................................................................. 17

35 U.S.C. § 307(a) ............................................................................................. 18

## **OTHER AUTHORITIES**

Restatement (Second) of Contracts § 201(1) (1981) .............................................. 9

Restatement (Second) of Contracts § 202(4) ....................................................... 9

Glaser
Weil

UUSI, LLC'S OPPOSITION TO APPLE INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:18-cv-04637-JD

# I.    <u>INTRODUCTION</u>

Apple's Motion for Summary Judgment (Dkt. 175) ("Motion") should be denied in its entirety.

First, Apple seeks summary judgment based on standing. But Apple's standing arguments conflict with the understanding of all parties to the assignment documents at issue—namely, that the three inventors of the '183 Patent all assigned their interests to the Plaintiff in this case, UUSI doing business as "Nartron." Under Michigan law, that mutual understanding controls and cannot be revisited years later by a stranger to the contracts like Apple. Nor does issue preclusion based on a decision by the Michigan district court in the *Samsung* case bar UUSI from opposing Apple's standing motion. The Michigan Court decided the standing issue on an incomplete record without considering all relevant assignment documents, its decision conflicts with a judgment from a different Michigan court, and Apple waived its ability to assert issue preclusion by invoking federal jurisdiction against UUSI in claiming invalidity of the '183 Patent. This part of Apple's Motion fails.

Second, Apple seeks summary judgment of no indirect or willful infringement, asserting it did not have pre-suit notice of the '183 Patent or its infringement thereof. But the facts demonstrate that UUSI provided Apple with ample notice of the '183 Patent (which Apple concedes) and the notice included detailed claim charts explaining how Apple's products practice a claim of the '183 Patent containing all material elements of the claims asserted in this case. This part of Apple's Motion fails.

Third, Apple seeks summary judgment that the asserted claims of the '183 Patent are indefinite. But Apple's indefiniteness arguments ignore the express teachings of the '183 Patent specification, conflict with the testimony of UUSI's technical expert, and have been squarely rejected by binding Federal Circuit precedent. This part of Apple's Motion fails.

# II.    <u>UUSI OWNS THE '183 PATENT AND HAS STANDING TO FILE SUIT</u>

## A.    Patent Ownership Factual Background

### 1.    The Evolution of Nartron

Norman Rautiola founded Natronic Company in Michigan in May 1968, which changed its name shortly thereafter to Nartron Corporation in June 1968. Rautiola Decl., ¶¶ 3-4. Nartron Corporation designed, developed, and manufactured electronic systems for the automotive industry and military. *Id*., ¶ 5. Since March 2010, Nartron Corporation no longer exists, with Plaintiff UUSI,

UUSI, LLC'S OPPOSITION TO APPLE INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:18-cv-04637-JD

LLC dba Nartron ("UUSI") having taken over as the owner of all the assets formerly belonging to Nartron Corporation, and continuing on the "Nartron" business name. *Id*., ¶¶ 7-8, Ex. 4.

The complete transition from Nartron Corporation to UUSI, LLC d/b/a Nartron took place over a number of years through a series of assignments. To start, Mr. Rautiola first transferred all of Nartron Corporation's assets to himself as an intermediary while the new UUSI entity was being formed. Next, Mr. Rautiola transferred all of Nartron Corporation's assets from himself to UUSI. Finally, Mr. Rautiola dissolved Nartron Corporation, and continued the "Nartron" name with UUSI.

Transferring Nartron Corporation's assets to Mr. Rautiola involved three-steps. First, on October 30, 2008, while Nartron Corporation was slowing operations, Nartron Corporation transferred its then-existing interest in the '183 Patent to Mr. Rautiola. *Id*., ¶ 16; Ex. 9. Second, on November 28, 2008, as Nartron Corporation's dissolution was nearing completion, Nartron Corporation assigned to Mr. Rautiola its remaining assets and property as of November 28, 2008. *Id*., ¶¶ 17-18; Ex. 10. Third, to ensure that all of Nartron Corporation's assets had transferred, on December 12, 2008, Nartron Corporation again assigned to Mr. Rautiola any remaining assets and property as of December 12, 2008 (to the extent Nartron Corporation acquired any new assets between November 28, 2008 and December 12, 2008). *Id*., ¶ 20; Ex. 12.

By December 12, 2008, Mr. Rautiola had formed his new company, Usi Nartron, LLC (which later changed its name in 2009 to UUSI, LLC). *Id*., ¶ 21. On December 12, 2008, Mr. Rautiola transferred all of Nartron Corporation's former assets and property that had been transferred to him (i.e., all the assets transferred to him on October 30, November 28, and December 12) to Usi Nartron, LLC. *Id*., ¶ 22, Ex. 14.

Finally, on March 30, 2010, the assetless Nartron Corporation officially changed its name from Nartron Corporation to Oldnar Corporation. *Id*., ¶¶ 7-8, Ex. 4. That same day UUSI, LLC (formerly Usi Nartron, LLC) filed a certificate of name change stating it would be doing business under the name "Nartron." *Id*., ¶ 24, Ex. 15. Since the formation of Usi Nartron, LLC in 2008, the "Nartron" name has been used exclusively by Usi Nartron/Plaintiff UUSI. *Id*.

### 2.    The '183 Patent and Inventorship Correction

The '183 Patent, claiming a novel electronic switching circuit for capacitive touch detection,

2

issued on August 18, 1998. *Id.*, Ex. 6. As originally issued, the '183 Patent identified Byron Hourmand as the sole inventor and Nartron Corporation as the assignee. *Id.*

In 2010, upon discovering that two of Nartron's engineers, John M. Washeleski and Dr. Stephen R.W. Cooper, had inadvertently been omitted as inventors, UUSI and Nartron filed a lawsuit in the Western District of Michigan seeking to correct inventorship. *Nartron Corp. and UUSI, LLC v. Hourmand*, No. 1:10-cv-00691-RHB (W.D. Mich.), Dkt. No. 1. On September 8, 2010, the Western District of Michigan approved a consent judgment adding Mr. Washeleski and Dr. Cooper as co-inventors. Rautiola Decl., Ex. 19. The judgment provided that "John M. Washeleski and Stephen R.W. Cooper were erroneously omitted as joint inventors of U.S. Patent No. 5,796,183." Rautiola Decl., Ex. 6. On October 11, 2011, the USPTO Director issued a Certificate of Correction adding Mr. Washeleski and Dr. Cooper as inventors of the '183 Patent. *Id.* at 34.

### 3.    Assignment History

#### a.    The Hourmand Interest

On January 31, 1996, as an employee of Nartron Corporation, Bryron Hourmand assigned his interest (the "Hourmand Interest") in the '183 Patent (then pending before the Patent Office) to his employer Nartron Corporation. *Id.*, Ex. 5. Two years later, on August 18, 1998, when the '183 Patent issued, the Hourmand Interest belonged to Nartron Corporation..

By late 2008, Nartron Corporation owed a large debt to Mr. Rautiola. To rid Nartron Corporation of the debt, Mr. Rautiola decided to (1) form a new company (eventually formed as Usi Nartron), (2) transfer all Nartron Corporations assets to himself, (3) assign those assets to the new company, and (4) dissolve Nartron Corporation. *Id.*, ¶¶ 12-23. All parties to these transactions entirely agree on the meaning and purpose of the contracts implementing this plan. On October 30, 2008, Nartron Corporation assigned its then-existing interest in the '183 Patent, the Hourmand Interest, to Mr. Rautiola. *Id.*, Ex. 9. Shortly thereafter, on November 28, 2008 and December 12, 2008, Nartron Corporation assigned its remaining assets and property to Mr. Rautiola. *Id.*, Exs. 10, 12. Also on December 12, 2008, Mr. Rautiola assigned "all of the assets and property" he had been assigned from Nartron Corporation to Usi Nartron, LLC. *Id.*, Ex. 14. In particular, Mr. Rautiola agreed to "hereby assign[], convey[], transfer[] and set[] over to Assignee [Usi Nartron, LLC] any and all of Assignor's

3

right, title and interest in and to the Assets," defining "Assets" as "all of the assets and property of Nartron Corporation," which included the '183 Patent (including the Hourmand Interest). *Id.*, Ex. 14. On December 4, 2009, Usi Nartron, LLC changed its name to UUSI, LLC. *Id.*, ¶ 24. On March 30, 2010, UUSI, LLC filed a certificate of name change stating it was doing business under the name "Nartron." *Id.*, ¶ 24, Ex. 15. The Hourmand Interest thereby transferred from Usi Nartron, LLC to UUSI, LLC, and then to UUSI, LLC dba Nartron accordingly.

The below timeline tracks the assignment history of the Hourmand Interest, and *all parties* to the assignment documents agree that the assignments transferred the Hourmand Interest from Hourmand to Nartron Corporation and then to Mr. Rautiola and finally to Usi Nartron:



### b.    The Washeleski and Cooper Interests

As employees of Nartron Corporation, Mr. Washeleski and Dr. Cooper each signed employment agreements providing for the automatic assignment of any inventions conceived or made by them during the course of their employments with Nartron Corporation. Specifically, on September 17, 1984 and again on April 18, 1989, Dr. Cooper signed agreements titled "Assignment and Agreement" agreeing to "hereby assign, transfer, and convey to COMPANY [Nartron Corporation], its successors and assigns, [his] entire right, title, and interest in and to any and all . . . inventions" conceived or made during his employment at Nartron Corporation. Hadley Decl., Exs. 21-22. Mr. Washeleski signed a substantively identical agreement on April 8, 1985. Rautiola Decl., Ex. 20 at 2.

And on June 10, 1992, Dr. Cooper signed an additional agreement, reaffirming that all inventions conceived during the course of his employment "shall be the exclusive property of [Nartron Corporation]." Hadley Decl., Ex. 23. Mr. Washeleski signed a substantively identical agreement on May 29, 1992. Rautiola Decl., Ex. 20 at 1.

On November 28, 2008, in anticipation of Nartron Corporation's dissolution, Nartron Corporation transferred all of its assets and properties to Mr. Rautiola, including any and all intangible assets, as discussed above, including "any and all of Assignor's right, title and interest in and to all of its assets and property of every kind and nature, real, intangible, and mixed, wherever located . . ." *Id.*, Ex. 10. On December 12, 2008, Nartron Corporation repeated the assignment. *Id.*, Ex. 12. By expressly including *intangible* interests, the November 28 and December 12 assignments included Washeleski and Cooper's non-vested, future rights in the '183 Patent (the "Washeleski and Cooper Interests"). *Id.*, Exs. 10, 12. Unlike the Hourmand Interest, those intangible interests arising from the Washeleski and Cooper employment agreements had not been transferred in the October 30, 2008 assignment, because that assignment was limited to Nartron Corporation's then-existing "right title and interest" in the '183 Patent, and on October 30, 2008, the only existing "right title and interest" in the '183 Patent was the Hourmand Interest. *Id.*, Ex. 9. Thus, Mr. Rautiola did not acquire Washeleski and Cooper's intangible interests in their employment agreements, including the non-vested Washeleski and Cooper Interests in the '183 Patent, until the November 28 and December 12, 2008 assignments.

On December 12, 2008, Mr. Rautiola then transferred "all of the assets and property" he had been assigned from Nartron Corporation to the newly formed Usi Nartron, LLC. *Id.*, Ex. 14. Mr. Rautiola agreed to "hereby assign[], convey[], transfer[] and set[] over to Assignee [Usi Nartron, LLC] any and all of Assignor's right, title and interest in and to the Assets," with the "Assets" being "all of the assets and property of Nartron Corporation," including the Washeleski and Cooper Interests. *Id.* Usi Nartron, LLC then changed its name to UUSI, LLC on December 4, 2009 (as explained above with respect to the Hourmand Interest), and on March 30, 2010, UUSI, LLC filed a certificate of name change to UUSI, LLC d/b/a Nartron. *Id.*, ¶ 24, Ex. 15.

The below timeline tracks the assignment history of the Washeleski and Cooper Interests.



Separate from these transfers, in late 2009, Mr. Washeleski recommended to Mr. Rautiola that all of the patents originally assigned to the dissolved Nartron Corporation should be assigned to UUSI. *Id.*, ¶ 26. Plainly, neither Mr. Rautiola nor Mr. Washeleski knew or remembered that all of Nartron Corporation's assets had already been transferred to Usi Nartron. On December 17, 2009, following Mr. Washeleski's recommendation, Mr. Rautiola directed counsel to assign all unexpired patents from Nartron Corporations to "Uusi, LLC." *Id.*, ¶ 27; Ex. 16.

On April 14, 2010, after discovering that Mr. Washeleski and Dr. Cooper were both omitted inventors, both attempted to assign their interest in the '183 Patent to UUSI (then doing business as "Nartron"). *Id.*, ¶ 29, Exs. 17-18. For these attempted assignments, Mr. Rautiola's outside counsel used the name "Nartron Corporation" on the assignments instead of UUSI doing business as "Nartron." *Id.*, ¶ 30. This was plainly an inadvertent error since "Nartron Corporation" had been dissolved and only one entity used the "Nartron" name at the time—Nartron as the business name of UUSI. *Id.*, ¶¶ 25, 30-32.

Again, *all parties* to the agreements assigning the Washeleski and Cooper Interests agree on the purpose and meaning of the assignment documents.

**B.    Nartron Is Not Barred from Asserting Ownership by Issue Preclusion**

Apple argues that the Michigan Court's decision in the *Samsung* case bars UUSI from

6

1    asserting ownership here under the doctrine of issue preclusion. Apple is wrong.

2        First, issue preclusion does not apply unless the parties have been "fully heard," with a

3    complete record before the Court. *Robi v. Five Platters, Inc.*, 838 F.2d 318, 327 (9th Cir. 1988). Issue

4    preclusion does not apply to prior decisions made on "an incomplete record." *Santos v. Farmers Ins.*

5    *Exch.*, No. 07-11229, 2008 WL 2937776, at *9 (E.D. Mich. July 24, 2008); *Abbott Lab'ys v. Andrx*

6    *Pharms., Inc.*, 473 F.3d 1196, 1205 (Fed. Cir. 2007). Here, the record before the Michigan Court in

7    *Samsung* was incomplete. Among other things, the Michigan Court did not consider Dr. Cooper's

8    employment agreements with Nartron Corporation, which automatically assigned any future interests

9    in all patents to UUSI. Apple does not dispute that these employment agreements are controlling and

10    render moot his later assignment. Instead, Apple only disputes the chain of title sequencing. Mot. at

11    19-20. But without considering these employment agreements, the Michigan Court incorrectly found

12    that Dr. Cooper's later 2010 assignment still controlled ownership. Dkt. 142-1 at 11.

13        Similarly, the Michigan Court did not consider key extrinsic evidence in determining the intent

14    of the parties and instead decided intent as a matter of law. The omitted evidence included UUSI's

15    contemporaneous patent license agreement with Sanyo Automedia, made just a few months after Mr.

16    Washeleski and Dr. Cooper's April 2010 assignments. This license expressly defines "Nartron" as

17    Plaintiff "Uusi, LLC d/b/a/ Nartron," and confirms that "Nartron" "has acquired the intellectual

18    property of Nartron Corporation," including the '183 Patent. Hadley Decl., Ex. 24 at 1, 14. This

19    language demonstrates that the parties to the 2010 Washeleski and Cooper assignments all understood

20    that "Nartron" referred to UUSI, the plaintiff in this case, and not the prior "Nartron Corporation,"

21    which had been dissolved. But without this evidence, Michigan Court found just the opposite.

22        Moreover, the Michigan Court declined to fully hear UUSI's position on the standing issue.

23    Although the Michigan Court considered arguments that Samsung raised for the first time in its reply

24    briefing, it declined to consider UUSI's proposed sur-reply responding to the new materials. *See* Dkt.

25    No. 142-1 at 12. By declining to "fully hear[]" UUSI's response to Samsung's new materials, issue

26    preclusion cannot apply. *Hiser v. Franklin*, 94 F.3d 1287, 1293 (9th Cir. 1996).

27        Second, it is well settled that a primary goal in applying issue preclusion is to "foster[ ] reliance

28    on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*,

*Glaser Weil*

7

440 U.S. 147, 153-54 (1979). Accordingly, a court may decline to apply issue preclusion when it would result in inconsistent rulings. *See Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1103 (6th Cir. 2012). Here, years before the Michigan Court in *Samsung* found that UUSI owned no ownership interest in the '183 Patent, a Michigan district court reached the exact opposite conclusion, entering a September 8, 2010 judgment expressly stating that Nartron Corporation had "assigned the '183 Patent to plaintiff UUSI LLC." Rautiola Decl., Ex. 19 at 2. Until the Federal Circuit decides which of these conflicting judgments is correct—which is being actively contested between UUSI and Samsung in the *Samsung* appeal—issue preclusion should not apply.

Third, in the Ninth Circuit, issue preclusion does not bar Article III standing where a defendant waives the jurisdictional issue by itself invoking federal jurisdiction. *Love v. Villacana*, 73 F.4th 751, 755–56 (9th Cir. 2023) (A defendant's "invocation of and acquiescence to the federal courts . . . is sufficient to waive jurisdictional issue preclusion."). Here, Apple itself invoked and acquiesced to federal court jurisdiction in its dispute with UUSI over the '183 Patent by filing six petitions for *Inter Partes* Review before the U.S. Patent and Trademark Office, naming UUSI LLC d/b/a Nartron as the respondent, and then appealing the PTAB's Final Written Decisions to the Federal Circuit, expressly stating in its opening brief that the Federal Circuit had "jurisdiction under 28 U.S.C. § 1295(a)(4)(A 35 U.S.C. § 141(c)." *Apple Inc. v. UUSI LLC dba Nartron*, Nos. 21-1035, 21-1036, 21-1057, 2101058, Fed. Cir. Case No. 21-1035, ECF No. 20 -11 (filed 03/03/2021). Thus, having represented that the judicial power of the United States extends to its dispute with UUSI, Apple cannot now assert jurisdictional issue preclusion. *Love*, 73 F.4th at 755–56.

## C.    UUSI Owns the '183 Patent

All of the parties to each assignment transferring interests in the '183 Patent to UUSI completely agree that UUSI owns the '183 Patent pursuant to those assignments. For the next ***20 years*** after the assignments were executed, the parties to the assignments in every instance acted in conformity with their understanding that UUSI owned the '183 Patent. Yet Apple, a stranger to the assignment agreements, now argues that the parties to those assignments did not understand their own agreements after all, and that UUSI never owed any interest in the '183 Patent under the terms of the assignments. Apple is wrong under the law and the facts.

Under controlling Michigan law, "[t]he cardinal rule of construction is that we seek to determine and to give effect to the intention of the parties" such that "[i]n the consensual framework that characterizes contractual relationships, *the parties are free to interpret their contract* in a mutually agreed manner." *Stark v. Budwarker, Inc.*, 25 Mich. App. 305, 313–14 (1970); *Dow Chem. Co. & Subsidiaries v. United States*, 278 F. Supp. 2d 844, 850 (E.D. Mich. 2003), *rev'd in part on other grounds Dow Chem. Co. v. United States*, 435 F.3d 594 (6th Cir. 2006) (citing Restatement (Second) of Contracts § 201(1) (1981) ("Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.") (emphasis added)). Indeed, in interpreting contracts, Michigan law "give[s] effect to the intention of the parties" and will not "exalt a 'literal' reading" that is not "inconsistent with that intention, to a higher status than the understanding and agreement of the parties themselves." *Stark*, 25 Mich. App. at 314; *see also* Restatement (Second) of Contracts § 202(1) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight"); *Id.*, § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

Apple asks this Court to do the opposite, even though Apple was not a party to any of the assignments. But all of the *parties* to the assignments agree on what the assignment language means and what the assignments transferred. Rautiola Decl., ¶¶ 12-23, 26-32. The parties to the assignments of the Hourmand Interest (Nartron Corporation, Mr. Rautiola, and UUSI dba Nartron) all agree that the language of the October 30, 2008, November 28, 2008, and December 12, 2008 assignments transferred all Nartron Corporation's assets, through Mr. Rautiola, to Usi Nartron (later renamed UUSI d/b/a Nartron), including the '183 Patent, to extinguish Nartron Corporation's debt to Mr. Rautiola. *Id.*, ¶¶ 12-23. Likewise, all parties to the assignments of the Washeleski and Cooper Interests (Nartron Corporation, Mr. Washeleski, Dr. Cooper, and UUSI d/b/a Nartron) all agree that the language of the employment agreements and assignment documents transferred the Washeleski and Cooper Interests in the '183 Patent to UUSI in much the same way. *Id.*, ¶¶ 26-32. Michigan law

9

requires that this undisputed mutual intent be upheld, particularly against a challenge from a non-party.

Aside from the law, Apple's standing arguments conflict with the terms of the assignments.

### 1. The Assignments Transferred the Hourmand Interest to UUSI

Despite Mr. Rautiola's transfer of "all" the former Nartron Corporation assets held by Mr. Rautiola as of December 12, 2008 to Usi Nartron, LLC, Apple argues that Mr. Rautiola still holds the Hourmand Interest because the transferred assets were limited to only the assets Mr. Rautiola received on December 12. Mot at 11-14. Even if Apple's reading of the assignment were entitled to some weight (it is not), it is wrong.

*First*, Apple's reading conflicts with the defined term "Assets" in the December 12, 2008 agreement. Where, as here, a contract defines a term with use of quotes and parentheses, the definition of that term is the words that appear ***before*** the parentheses, not the words that appear ***after***. *Novacor Chemicals, Inc. v. United States*, 171 F.3d 1376, 1381 (Fed. Cir. 1999) ("general principles of construction support the view that a parenthetical is the definition of the term which it follows"); *Lawson v. Spirit AeroSystems, Inc.*, 61 F.4th 758, 764 (10th Cir. 2023); *Clewett v. New Wave Power, LLC*, No. 3:21-CV-0692-S, 2023 WL 5986472, at *7 (N.D. Tex. Sept. 13, 2023) ("the capitalized term within the parentheses refers only to the immediately preceding nouns and their modifiers"). Here, the provision defining Assets reads: "Whereas [Mr. Rautiola] is the assignee of all of the assets and property of Nartron Corporation (the 'Assets') under a certain Assignment Agreement dated Dec 12, 2008." Rautiola Decl., Ex. 14. Thus, "Assets" is defined only by the words preceding the parenthetical—namely, "all of the assets and property of Nartron Corporation." Indeed, in all the assignment documents, including the October 30, 2008 assignment, the November 28, 2008 assignments, and the December 12, 2008 assignments, the parties maintained a consistent practice of defining terms based on the words appearing *before* the parenthesis, demonstrating a consistent drafting practice and established course of dealing. *See Cruz-Martinez v. Dep't of Homeland Sec.*, 410 F.3d 1366, 1371 (Fed. Cir. 2005) (where "extrinsic evidence [] show[s] a binding past practice . . . the past practice fills a gap in the contract"); *see, e.g.*, Rautiola Decl., Ex. 9 (defining "the assigned patent" by the words preceding the parenthetical); Ex. 10 (defining "Assignment," "Assignor," and

1    "Assignee" by the words preceding the parenthetical); Exs. 11, 12, 14 (same).

2        *Second*, Apple speculates that the "parties' choice" to specifically reference the December 12

3    agreement "confirms" the parties' intent. Mot. at 13. But Apple's speculation is entitled to no weight

4    under Michigan law, and it conflicts with the express intent of the contracting parties. Mr. Rautiola

5    explained in his sworn declaration, the December 12, 2008 assignment to Usi Nartron, LLC was

6    intended to include "all assets and property of Nartron Corporation," which includes the '183 Patent

7    (and with it the Hourmand Interest).  Rautiola Decl., ¶¶ 20, 22. Mr. Rautiola's sworn testimony is

8    uncontroverted, and controls.

9        *Third*, Apple's argument that UUSI's reading would render the phrase "under a certain

10   Assignment Agreement dated Dec 12, 2008" "superfluous" lacks merit. Mot. at 13. The December

11   12, 2008 Nartron Corporation-to-Rautiola assignment completed the transfer of assets to Mr. Rautiola.

12   Rautiola Decl., ¶ 22. Accordingly, the reference to the "Dec 12 2008" assignment in the Rautiola-to-

13   Usi Nartron agreement simply states the effect of the parties' express definition of Assets—*i.e.*, that

14   "under" (meaning "*as of*") the December 12, 2008 Assignment, Nartron Corporation had completed

15   the assignment to Mr. Rautiola of *all* of the assets that it formerly owned (which occurred through the

16   three separate asset transfers on October 30, 2008, November 28, 2008, and December 12, 2008). *Id.*,

17   Exs. 9, 10, 12. In other words, the "under" phrase confirmed that whatever former Nartron

18   Corporation assets Mr. Rautiola *held as of December 12, 2008*, regardless of when Mr. Rautiola

19   acquired those assets, were the subject of the assignment to Usi Nartron.

20       *Fourth*, Apple's interpretation of "Assets" to mean only the assets that Nartron Corporation

21   assigned to Mr. Rautiola on December 12, 2008, would erroneously result in *nothing* transferring.

22   Nartron Corporation had already transferred all of its remaining assets to Mr. Rautiola on November

23   28, 2008. *Id.*, Ex. 10. Nartron Corporation had nothing left to transfer to Mr. Rautiola on December

24   12, 2008. Thus, if—as Apple alleges—the December 12, 2008 assignment from Mr. Rautiola to Usi

25   Nartron transferred *only* the assets that Mr. Rautiola received from Nartron Corporation on the *same*

26   December 12, 2008 date, and not by either of the October 30 or November 28 assignments, then the

27   December 12, 2008 assignment transferred *nothing*. Such a nonsensical interpretation "should be

28   avoided." *Wexler v. Dep't of Interior*, 909 F.2d 1496 (Fed. Cir. 1990); *see also Pac. Gas & Elec. Co.*

*v. United States*, 536 F.3d 1282, 1289 (Fed. Cir. 2008) (refusing to interpret contract so that "the contract would be meaningless and nonsensical"); *BGT Holdings LLC v. United States*, 984 F.3d 1003, 1011 (Fed. Cir. 2020) (rejecting interpretation "because it would produce absurd results").

In sum, as all parties to the assignments agree, the "Assets" assigned from Mr. Rautiola to UUSI are *not* limited to only those in the December 12, 2008 assignment from Nartron Corporation to Mr. Rautiola, but rather include all the assets transferred from Nartron Corporation to Mr. Rautiola between October 2008 and December 2008, which indisputably includes the Hourmand Interest in the '183 Patent. If nothing else, genuine issues of fact exist such that summary judgment is inappropriate.

### 2.    UUSI Owns the Washeleski and Cooper Interests

#### a.    Mr. Washeleski and Dr. Cooper Automatically Assigned Their Interests to UUSI Via Their Employment Agreements

Apple contends that Mr. Rautiola owns the Washeleski and Cooper Interests in the '183 Patent. Mot. at 21. This is incorrect.

Mr. Washeleski and Dr. Cooper both signed employment agreements that automatically assigned to Nartron Corporation their rights in future inventions "without the need for any additional act." *Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (language "hereby conveys, transfers and assigns" automatically transferred the employee's rights, such that "no further act would be required once an invention came into being; the transfer of title would occur by operation of law"). While the automatic assignment rights in the employment agreements were intangible and unvested, they were nonetheless the property of Nartron Corporation until November 28, 2008, when Nartron Corporation transferred "all of its assets," including "assets and property of every kind and nature, real, intangible, and mixed, wherever located," to Mr. Rautiola. Rautiola Decl.., Ex. 10. Then, on December 12, 2008, Mr. Rautiola transferred those same rights, again including Nartron Corporation's intangible rights under the Washeleski and Cooper employment agreements, to Usi Nartron, LLC. *Id*., Ex. 14. Thus, by December 12, 2008, the automatic assignment rights granted under Mr. Washeleski and Dr. Cooper's employment agreements were owned by Plaintiff UUSI. And when the USPTO Director issued a Certificate of Correction adding Mr. Washeleski and Dr. Cooper as named inventors of the '183 Patent

on October 11, 2011, the Washeleski and Cooper Interests vested and were automatically assigned to UUSI. *Id.*, Ex. 6 at 34.

Unlike the broad scope of the November 28 and December 12 assignments, the October 30, 2008 assignment of the '183 Patent from Nartron Corporation to Mr. Rautiola did not transfer any of Nartron Corporation's intangible assets to Mr. Rautiola, such as the rights under Mr. Washeleski and Dr. Cooper's employment contracts. Instead, the October 30, 2008 assignment only transferred Nartron Corporation's then-existing interest in the '183 Patent itself. *Id.*, Ex. 9. At that time, Nartron's existing interest in the '183 Patent was limited to the Hourmand Interest. Thus, the October 30, 2008 assignment transferred only that tangible, vested interest in the '183 Patent itself, and not any intangible future rights or property stemming from Mr. Washeleski and Dr. Cooper's employment agreement. *Id.*[1]

Even if the October 30, 2008 agreement contemplated the transfer of future rights, the agreement did not effect a present assignment of those future rights. Instead, the October 30 agreement required further action by Nartron Corporation to convey any such future rights. *Id.* (stating "ASSIGNOR agrees at any time to execute and to deliver upon request of the ASSIGNEE such additional documents."). Unlike a present assignment of future rights, this language required further action by Nartron. Thus, the October 30, 2008 language regarding future rights "[did] not create an immediate assignment" of future rights and could not have transferred any unvested future rights in the '183 Patent. *Advanced Video Techs. LLC v. HTC Corp.*, 879 F.3d 1314, 1317-18 (Fed. Cir. 2018).

        **b.    Mr. Washeleski and Dr. Cooper Conveyed Their Interests to UUSI a Second Time in Separate 2010 Assignments**

In conflict with its argument that Mr. Rautiola owns the Washeleski and Cooper Interests, Apple also contends that the dissolved Nartron Corporation owns those interest. Mot. at 16. This is incorrect as well. Even if the November and December 2008 assignments did not automatically

---

[1] Even if the October 30, 2008 assignment did transfer the Washeleski and Cooper Interests to Mr. Rautiola, that interest would have nonetheless still transferred to UUSI in December 2008, as one of the "all" assets of Nartron Corporation transferred to USI Nartron in the December 2008 assignment, for the same reasons that the Hourmand Interest transferred to UUSI as explained *supra*.

transfer the unvested, intangible, future Washeleski and Cooper Interests to UUSI, both Mr. Washeleski and Dr. Cooper signed April 14, 2010 assignments expressly transferring their interests in the '183 Patent to "Nartron" as the business name of UUSI. Rautiola Decl., ¶¶ 29-30, Exs. 17-18.

Apple argues that the April 14 assignments "intentionally" transferred the Washeleski and Cooper Interests to "Nartron Corporation," and not to UUSI doing business as "Nartron." Mot. at 15. Apple's after-the-fact argument plainly conflicts with the intent of the parties to the assignments. Contrary to Apple's contention, substantial contemporaneous evidence confirms that the assignment documents mistakenly used "Nartron Corporation" as the assignee name instead of "Nartron."

*First*, Nartron Corporation did not exist at the time of the April 14 assignments. By that time, Nartron Corporation has already transferred away all of its rights and properties, both tangible and intangible, to UUSI through Mr. Raoutila. Nartron Corporation had nothing left. On March 30, 2010, Nartron Corporation dissolved, officially changing its name to Oldnar Corporation, and "Nartron Corporation" thereafter ceased to exist.  Rautiola Decl., ¶¶ 7-8, Ex. 4. To further transfer the "Nartron" corporate name to UUSI, on March 30, 2010, UUSI, LLC filed paperwork confirming it was the corporation doing business under the "Nartron" name. *Id.*, ¶ 24, Ex. 15. Thus, when Mr. Washeleski and Dr. Cooper purported to assign their rights to "Nartron Corporation" on April 14, 2010, the only entity in existence operating under the "Nartron" name was UUSI.

*Second*, all parties to the assignments unequivocally confirm that the intent was to assign the Washeleski and Cooper Interests in the '183 Patent to the only existing entity doing business as Nartron, *i.e.*, UUSI. Mr. Rautiola explained in his sworn declaration that he intended for Mr. Washeleski and Dr. Cooper to assign their interests to UUSI. *Id.*, ¶ 30. Mr. Tuttle, the attorney who drafted the assignments, confirms that he mistakenly used "Nartron Corporation" instead of "Nartron" in referring to UUSI's business name, and that he would not have named a non-existent company as the assignee. Tuttle Decl., ¶ 4. Under Michigan law, this uncontradicted testimony alone suffices to determine the correct assignee, not the after-the-fact argument of a non-party to the agreements. *See Stark*, 25 Mich. App. at 313-4; *Copperhead Indus. Inc. v. G.E. Schmidt, Inc.*, No. 1:17-CV-609, 2018 WL 2412339, at *7 (S.D. Ohio May 29, 2018), *report and recommendation adopted*, No. 1:17-CV-609, 2018 WL 4223143 (S.D. Ohio Sept. 5, 2018) (finding that Courts may rely on declarations from

1    company officers in ascertaining the intent of an assignment agreement).

2          Mr. Washeleski and Dr. Cooper's intent is confirmed in other documents as well. For example,

3    just months prior to his April 2010 assignment, Mr. Washeleski recommended to Mr. Rautiola that

4    all of Nartron Corporation's patents be assigned to UUSI, and Mr. Rautiola directed Mr. Washeleski

5    to do so (which he did). Rautiola Decl., ¶¶ 26-27; Ex. 16. Accordingly, at the time Mr. Washeleski

6    executed the April 2010 assignment he knew that the '183 Patent had been assigned to UUSI. It would

7    have made no sense for Mr. Washeleski to intend an assignment to the dissolved Nartron Corporation,

8    instead of "Nartron" as the business name of UUSI, when he had just effected an assignment of all of

9    Nartron Corporation's patents to UUSI. Dr. Cooper also knew that the '183 Patent had been assigned

10   to UUSI prior to his April 2010 purported assignment, and had no reason to assign his interest to the

11   defunct Nartron Corporation rather than UUSI. *Id.*, ¶ 32.

12         *Third*, no extrinsic evidence supports Apple's position. For example, Apple points to the

13   Hourmand lawsuit, but that lawsuit **supports**, not contradicts, the parties' mutual intent. Mot at 15;

14   Apple Ex. 4. UUSI was a plaintiff in that lawsuit. If UUSI did not have an ownership interest in the

15   '183 Patent (as Apple contends), then it would not have had standing in the Hourmand lawsuit.

16   Including UUSI as a plaintiff confirms the parties' understanding that UUSI had an ownership interest

17   in the patent, which is all that is needed for standing here, as "an individual co-owner has Article III

18   standing." *See Intell. Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 816 (Fed. Cir. 2024).

19         In fact, other extrinsic evidence directly conflicts with Apple's argument. On October 2010,

20   just months after Mr. Washeleski and Dr. Cooper's April 2010 assignments, UUSI entered into a

21   patent license agreement with Sanyo Automedia. Hadley Decl., Ex. 24. That agreement explains that

22   "Nartron," defined as Plaintiff "Uusi, LLC d/b/a/ Nartron," "has acquired the intellectual property of

23   Nartron Corporation." *Id.*, Ex. 24 at 1. And the "Licensed Patents" that UUSI agreed to license to

24   Sanyo (just six months after Mr. Washeleski and Dr. Cooper's assignments) explicitly include the

25   '183 Patent. *Id.*, Ex. 24 at 1, 14.

26         *Fourth*, even Apple itself understood UUSI to have an ownership interest, as Apple identified

27   UUSI as the owner of the '183 Patent in its Federal Circuit appeal. Hadley Decl., Ex. 25. Samsung

28   made the exact same identification in its IPR petition, identifying "UUSI, LLC d/b/a Nartron" as the

1   "Patent Owner" before the USPTO. *Id.*, Ex. 26. Apple's representations are binding admissions.

2   *Ferguson v. Neighborhood Hous. Servs., Inc.*, 780 F.2d 549, 551 (6th Cir. 1986) (party's admission

3   of jurisdictional fact eliminated need for evidence of that fact, and precluded admitting party from

4   later arguing against that fact); *Saghian v. Shemuelian*, 835 F. App'x 351, 352–53 (10th Cir. 2020)

5   (refusing to consider post-pleading evidence that conflicted with admitted jurisdictional fact in the

6   pleadings because the admission was binding). Even if not binding, at the very least, there is ambiguity

7   as to the parties' intent with respect to assignment, such that summary judgment is inappropriate. *See*

8   *Core Optical Techs., LLC v. Nokia Corp.*, 102 F.4th 1267, 1274 (Fed. Cir. 2024) (reversing summary

9   judgment of lack of standing, and remanding for trial, where an ambiguity existed in assignment

10  language).

11       Administrative mistakes in identifying the name of an assignee do not defeat standing "where

12  the intent of the parties is clear." *Shower Enclosures Am., Inc. v. BBC Distribution Corp.*, No.

13  3:15CV627, 2016 WL 3031081, at *2 (N.D. Ind. May 27, 2016). Here, the intent of the parties is clear

14  from their own testimony and all contemporaneous evidence. Apple contends that naming "Nartron

15  Corporation" as the assignee in the Washeleski and Cooper assignments was not a "typographical

16  error" because "UUSI" and "Nartron Corporation" are not "similarly named." Mot. at 15. But Apple

17  ignores that both UUSI and Nartron Corporation operated under the identical "Nartron" corporate

18  name. Mr. Rautiola confirms that he asked counsel to prepare assignments to "Nartron," referring to

19  the business name for UUSI, and Mr. Tuttle confirms that he mistakenly used Nartron Corporation

20  instead of "Nartron" as the business name of UUSI. Rautiola Decl., ¶ 30; Tuttle Decl., ¶ 4. Thus, the

21  use of "Nartron Corporation" in the assignments resulted from confusion over the common Nartron

22  name (which the company had gone by for nearly 40 years) rather than an intent to assign the

23  Washeleski and Cooper interests to a dissolved company with no assets.

24       Finally, Apple's contention that the intended assignee of the Washeleski and Cooper Interests

25  was the dissolved Nartron Corporation is legally wrong. "[A] patent assignment to a dissolved

26  corporation is void." *Sell Below Cost USA LLC v. Blue Island Holding Grp. (US) Inc.*, No.

27  19CV6095KAMRER, 2021 WL 1394284, at *5 (E.D.N.Y. Feb. 9, 2021), *report and recommendation*

28  *adopted*, No. 19-CV-6095(KAM)(RER), 2021 WL 777015 (E.D.N.Y. Mar. 1, 2021). Accordingly, an

Glaser Weil

assignment to Nartron Corporation "would be void as a matter of law." *Imperium (IP) Holdings, Inc. v. Apple Inc.*, No. 4:11-CV-163, 2012 WL 2995997, at *4 (E.D. Tex. June 4, 2012), *report and recommendation adopted*, No. 4:11-CV-163, 2012 WL 2995697 (E.D. Tex. July 23, 2012). Thus, the only relevant entity Mr. Washeleski and Dr. Cooper could have properly assigned their interests to was UUSI, to whom Nartron Corporation had already transferred all its assets.

All that aside, the evidence surrounding the intended assignee of the Washeleski and Cooper Interests creates genuine issues of material fact, such that summary judgment is inappropriate. *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 706 (Fed. Cir. 2008) (affirming denial of summary judgment for lack of standing based on "genuinely disputed issue of material fact").

### D.    UUSI Has Statutory Standing

As discussed, UUSI is the owner of each of the Houmand, Washeleski, and Cooper Interests in the '183 Patent. As such, UUSI has statutory standing as the "patentee." *See* 35 U.S.C. § 281. In any event, statutory standing may be cured during the litigation. *See Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235-36 (Fed. Cir. 2019). Accordingly, to ensure that all three of the ownership interests in the '183 Patent are within UUSI, Mr. Rautiola and Oldnar Corporation have assigned their rights, to the extent they have any rights in the '183 Patent, to UUSI. Hadley Decl., Exs. 27-28. These assignments resolve any alleged "statutory standing" issue.

### III.    APPLE IS NOT ENTITLED TO SUMMARY JUDGMENT ON WILLFUL OR INDIRECT INFRINGEMENT

UUSI agrees with Apple that "indirect or willful infringement … 'both require proof, for each asserted patent, that the defendant knew or should have known (1) of the patent, and (2) that it was infringing the patent.'" Motion at 21 (*quoting VLSI Tech. LLC v. Intel Corp.*, 706 F. Supp. 3d 953 (N.D. Cal. 2023)). But the undisputed evidence shows that Apple *did* know about the '183 Patent before UUSI filed suit. And there is sufficient evidence for a jury to conclude that Apple "knew or should have known" it was infringing the '183 Patent before suit was filed. Thus, Apple's request for summary judgment of no willful and indirect infringement should be denied.

### A.    Apple Had Actual Knowledge of the '183 Patent Before UUSI Filed Suit

In its Answer, Apple *admits* that it has known of the '183 Patent since 2007, six years before

1    UUSI filed suit. Dkt. 10, ¶ 24. Specifically, Apple admits that: (i) "in 2007, Nartron made Apple

2    aware of the '183 Patent;" and (ii) "[i]n late 2007, Nartron contacted Apple alleging that … Apple

3    iPods infringed certain claims of the '183 Patent." *Id.* This is confirmed by several Exhibits Apple

4    itself filed in support of its Motion, including: (i) Exhibit 24 (Dkt. 175-25), a May 22, 2007 letter from

5    Nartron's counsel to Apple, which enclosed a copy of the '183 Patent and alleged that Apple's iPod

6    2 product infringed at least "claims 1, 21, and 27" of the '183 Patent; Exhibit 25 (Dkt. 175-26), a July

7    16, 2007 letter from Apple to Nartron's counsel, confirming receipt of the infringement charge letter;

8    and (iii) Exhibit 26 (Dkt. 175-27), an August 1, 2007 letter from Nartron's counsel to Apple, enclosing

9    a claim chart showing why at least claim 1 of the '183 Patent was infringed by the iPod products.

10    Thus, both by admission (Dkt. 10, ¶ 24) and through clear documentary evidence, Apple was aware

11    of the '183 Patent no later than 2007, six years before UUSI filed suit. Apple's 30(b)(6) witness on

12    pre-suit knowledge, Matthew Clements, conceded as much. *See* Hadley Decl., Ex. 29 (Clements

13    deposition) at 74:11-75:75:15 (admitting there were communications between Apple and Nartron

14    regarding the '183 Patent in 2007), 76:22-77:17 (admitting Apple stored the 2007 communications in

15    its "database" of patent "assertion letters" and "prelit[igation] communications"), 85:7-86:7

16    (admitting Apple received UUSI's claim chart and opened a specific matter number for its

17    communications with Nartron).

18        Despite this overwhelming evidence, Apple still argues it lacked the requisite pre-suit

19    knowledge because, according to Apple, there is no evidence it knew about the *reexamination*

20    *certificate* containing the Asserted Claims (claims 38-39) until UUSI filed suit. Motion at 22. Apple

21    cites no Federal Circuit or Supreme Court decision holding that pre-suit knowledge of a reexamination

22    certificate is required. To the contrary, Apple admits all that is required is pre-suit knowledge "of the

23    patent." Motion at 21. Unlike a reissue, a reexamination does not result in a new patent—it simply

24    appends a reexamination certificate to the existing patent, which may or may not cancel, amend, or

25    add claims. *Compare* 35 U.S.C. § 307(a) (after reexamination, the "Director will issue and publish a

26    certificate," but not issue a new patent) *with* 35 U.S.C. § 251 (in reissue, patentee must "surrender"

27    the original patent, and the "Director shall … reissue the patent … in accordance with a new and

28    amended application"). Thus, because Apple has known about the '183 Patent since 2007, and that

1    same patent is the one UUSI is asserting in this case (albeit with the addition of a reexamination

2    certificate), Apple had pre-suit knowledge "of the patent," as required.

3        Apple's cases (Motion at 22)—all non-binding—do not hold otherwise.

4        In *MONEC Holding AG v. Motorola Mobility, Inc*., 897 F. Supp. 2d 225, 232 (D. Del. 2012),

5    the alleged infringer was *never* given pre-suit notice of the patent, either before or after the

6    reexamination. Rather, the patentee alleged that the infringer should have known about the patent

7    because the pre-reexamination patent was asserted "in litigation" against "Defendants' competitors

8    Apple and Hewlett-Packard," and that litigation "received substantial press coverage which likely

9    would have been followed and monitored." *Id.* at 228-229. The court found these allegations

10   insufficient to show that MONEC had knowledge of the pre-reexamination patent, because "there is

11   no presumption of actual knowledge from … other patent suits" against "competitors." *Id.* at 233. The

12   court then found, *a fortiori*, that because defendants did not have knowledge of the pre-reexamination

13   patent, they did not have knowledge of the patent as reexamined. *Id.* at 232-233. Here, by contrast,

14   Apple received **express** pre-suit notice of the patent six years before UUSI filed suit. And unlike in

15   *MONEC* (where all claims of the patent were amended in reexamination),[2] UUSI asserted only

16   original claim 1 of the '183 Patent against the iPod products in 2007 (Dkt. 175-27), which was **not**

17   amended in reexamination. Dkt. 1-1 at 36 of 42 ("Claims 1-17, 19-29 and 29-31 were not

18   reexamined"). Thus, *MONEC* is inapposite, because Apple undisputedly had pre-suit knowledge of

19   the '183 Patent, including claim 1 thereof (which survived reexamination).

20       In *CAO Lighting, Inc. v. Gen. Elec. Co*., No. CV 20-681-GBW, 2023 WL 387585 (D. Del.

21   Jan. 25, 2023), the plaintiff originally filed a lawsuit against multiple defendants in Utah, asserting

22   infringement of a patent. *Id.* at *1. The Utah defendants filed multiple reexamination requests, and

23   the case was stayed pending reexamination. *Id.* at *1. As a result of the reexaminations, all of the

24   original claims of the patent were canceled and replaced with an entirely new set of claims. *Id.* After

25   the reexaminations, the plaintiff filed a new case against a different (but overlapping) set of defendants

26   in Delaware, asserting the new claims. *Id.* The court granted certain defendants' motions to dismiss

27   _____

28   [2] *See* Hadley Decl., Ex. 30 (patent-in-suit in *MONEC*) at 14 of 14 (showing that claim 1, the only original independent claim, was amended).

Glaser
Weil

the claim for pre-suit willful infringement. *Id.* at \*2. In so doing, it acknowledged that these defendants—at least one of which, Osram, had been party to the Utah case—were aware of the patent-in-suit, and also knew that "new claims had been added to the patent" in the reexaminations. *Id.* However, the court found there was no plausible allegation that these defendants "knew or should have known ***they infringed the patent as it existed after the reexamination***," because "[n]one of the same claims that had been asserted previously [in Utah] still existed." *Id.* Thus, the decision turned on whether the defendants ***knew they infringed*** the patent, not whether they were aware of the patent—which the court conceded they were. *Id.* Thus, *CAO* does not stand for the proposition asserted by Apple, i.e., that separate "knowledge of a ***reexamined*** patent," as opposed to "[k]knowledge of an ***original*** patent," is required. Motion at 22. And *CAO* is factually inapposite because, there, all of the original claims were canceled, whereas here, at least claim 1—the very claim UUSI asserted against Apple in its communications in 2007—survived the reexaminations.

Finally, *Sentius Int'l, LLC v. Microsoft Corp.*, 78 F. Supp. 3d 967 (N.D. Cal. 2015) is inapposite because that case involved a reissued patent, not a reexamined patent. As discussed above, reissue requires surrender of the original patent, and results in issuance of a new patent with a new patent number. Thus, the *Sentius* court's rejection of plaintiff's "last ditch … alternative theory that knowledge of the reissue patents can reasonably be inferred from Microsoft's knowledge of the predecessor '720 patent" has no bearing on the issue at bar. Here, there is only one patent—the '183 Patent—and Apple undisputedly had knowledge of that patent before UUSI filed suit.

Unlike Apple's cases, *CAO Lighting, Inc. v. Feit Electric Company, Inc.*, 2020 WL 7786580 (C.D. Cal. 2020) is on point and instructive. This California *CAO* case is related to the Delaware *CAO* case discussed above. Here, the plaintiff sued the Defendant, Feit, in the Utah action. After the reexaminations, the Utah court dismissed Feit for lack of personal jurisdiction, and the plaintiff re-filed against Feit in California. *Id.* Feit moved to discuss all willful infringement allegations, because while it conceded "it was aware of the original patent," "Plaintiff did not allege any facts showing that Defendants had actual knowledge of ***the reexamined*** [] Patent." *Id.* at \*4. The court ***rejected*** this argument, and held that plaintiff's allegation of knowledge of the pre-reexamination patent was sufficient to state a claim for willfulness. *Id.* at \*5. In so doing, the court expressly distinguished

1    *MONEC* on grounds that, there, the plaintiff only "charg[ed] knowledge … based upon …

2    participation in the same market, media publicity and unrelated litigation by the defendant's

3    competitors … whereas in the case at bar, Defendant … was actually accused of infringing the []

4    patent." *Id.* at *5. So too here; UUSI "actually accused" Apple's iPods of infringing the '183 Patent

5    in 2007, and the claims UUSI asserted in those communications survived the reexamination.

6        Thus, under *CAO v. Feit*—the only cited case on point—there is sufficient evidence for a

7    factfinder to conclude that Apple had the required pre-suit knowledge of the '183 Patent.

8        **B.    There Is Sufficient Evidence Apple Had Pre-Suit Knowledge of Infringement**

9        There is also sufficient evidence for a reasonable factfinder to conclude that Apple "knew or

10   should have known … that it was infringing the ['183] patent.'" *VLSI.*, 706 F. Supp. 3d at 991.

11       Apple knew, or should have known, that its iPod products infringed at least claim 1 of the '183

12   Patent by no later than 2007, because UUSI provided detailed claim charts showing exactly how those

13   products infringed at least that claim. Dkt. 175-27. This included detailed evidence that the iPod

14   products: (i) had "an oscillator providing a periodic output signal having a frequency of 50 kHz or

15   greater;" (Dkt. 157-27 at 4 of 9); (ii) had an "input touch terminal … defining an area for an operator

16   to provide an input by proximity and touch" (*id.* at 5 of 9); (iii) sensed "an operator's body capacitance

17   to ground … through said input touch terminal" (*id.* at 6 of 9); and (iv) had "a detector circuit coupled

18   to said oscillator for receiving said periodic output signal from said oscillator, and coupled to said

19   input touch terminal" (*id.* at 7 of 9); (v) where the "detector circuit" provided a "control output signal"

20   after sensing "the presence of an operator's body capacitance to ground" (*id.* at 8 of 9); and (vi) where

21   this occurred when "the sensed body capacitance to ground exceeds a threshold level" (*id.* at 9 of 9).

22   The foregoing elements of claim 1 include the lion's share of the elements of the claims UUSI is

23   asserting against Apple in this case, claims 37-39. UUSI has expressly accused Apple's iPod products

24   of infringing claims 37-39 in its infringement contentions. Dkt. 175-34 at 3 of 26. And Apple, after

25   starting to infringe with its iPod products, continued and expanded its infringement by incorporating

26   similar touch detection functionality in its iPhone and iPad products. *Id.* at 3, 9-25.

27       Put together, the evidence establishes that: (i) Apple knew, or should have known, that at least

28   its iPod 2 infringed at least claim 1 of the '183 Patent by 2007; (ii) Apple's legal department opened

Glaser
Weil

1  an entry in its "prelit[igation] database" for Nartron and the '183 Patent in 2007 (Clements Dep.,

2  76:22-77:23); (iii) Apple proceeded to introduce touch detection functionality similar to that in the

3  iPod 2 in its later iPod models, and in its iPhone and iPads products (*i.e.*, the Accused Products in this

4  case); and (iv) there is substantial overlap between the elements of Asserted Claims 37-39 and of

5  claim 1, the claim UUSI charted against Apple in 2007. On these facts—and the additional facts that

6  will be adduced at trial—there is sufficient evidence for a reasonable factfinder to conclude that Apple

7  knew, or should have known, that it infringed the '183 Patent (including the Asserted Claims) prior

8  to UUSI filing suit. Thus, Apple's motion for summary judgment on this ground should be denied.

9  **IV.    THE '183 PATENT IS NOT INDEFINITE**

10      **A.    Apple Fails to Show that "Closely Spaced" is Indefinite**

11      Apple bears the burden to prove indefiniteness by clear and convincing evidence. *Nature*

12  *Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1360 (Fed. Cir. 2022). It has not met that burden.

13  The meaning of "closely spaced" is clear. Lay jurors will understand that "closely spaced" means

14  what it says: that the input touch terminals are spaced closely together. The Court agreed, adopting

15  the plain and ordinary meaning for this term and rejecting Apple's contrary construction. 3/20/2025

16  Transcript at 22:25-23:2.

17      Now, Apple contends that "closely spaced" is indefinite because it has no "objective

18  boundaries" and would otherwise be unclear to a POSITA. But neither Apple, nor the Federal Circuit,

19  nor this Court have had any trouble understanding this term. "Closely spaced" is not indefinite, just

20  as the Federal Circuit has found for similar terms in other cases. *Rosemount, Inc. v. Beckman*

21  *Instruments, Inc.,* 727 F.2d 1540, 1546 (Fed. Cir. 1984) (holding "close proximity" to be a term of

22  degree which did not render the claims indefinite); *Andrew Corp. v. Gabriel Elecs., Inc.,* 847 F.2d

23  819, 821 (Fed. Cir. 1988) (same for "close to"). Such terms of degree "are ubiquitous in patent

24  claims," and "[s]uch usages, when serving reasonably to describe the claimed subject matter to those

25  of skill in the field of the invention … have been accepted in patent examination and upheld by the

26  courts." *Andrew Corp.*, 847 F.2d at 821. "All that is required is some standard for measuring the term

27  of degree" that would be understood by "a person of ordinary skill in the art" ("POSITA"). *Exmark*

28  *Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp.,* LLC, 879 F.3d 1332, 1346 (Fed. Cir. 2018).

Here, the '183 Patent specification provides a "standard" by which a POSITA can measure whether the claimed "array of input touch terminals of a keypad" is "closely spaced." The specification explains that a major problem with "dense arrays of [touch] switches," including the claimed "closely spaced array," is that they are susceptible to "unintended actuations" of nearby switches. '183 Patent, 3:63-4:4. In particular, in closely-spaced arrays, "[s]kin oils, water, and other contaminants can form conductive films that overlay and capacitively couple adjacent or multiple touch pads," such that "[a]n operator making contact with the film can then couple multiple touch pads to his or her body capacitance… result[ing] in multiple actuations where only one is desired." *Id.*, 4:17-24. As the specification explains, this is a particular problem in closely-spaced arrays because "[s]mall touch terminals placed in close proximity by necessity require sensitive detection circuits," rendering them susceptible to contamination-induced crosstalk. *Id.*, 4:24-27.

This confirms that a POSITA would understand "closely spaced" to mean spaced sufficiently close that there is a risk of contamination-crosstalk. Thus, "closely spaced" does not depend on any "subjective" opinion. The touch terminals are either spaced sufficiently close that contamination can cause crosstalk, or they are not. That is an objective determination that a POSITA can make using objective criteria. As Dr. Cairns confirms, "[t]he main problem the invention sought to solve, and did solve, was the cross-talk that occurs in closely-spaced arrays due to surface contamination. … Therefore, a POSITA would understand that 'closely spaced' simply means spaced close enough that surface contamination-induced crosstalk can be a problem." Cairns Rebuttal Report, ¶ 204.

Apple presents a series of strange hypotheticals to argue that the "closely spaced" term is subjective. But courts have long noted that "[e]ven where some experimentation is required to fix the limits of words of degree … the claim is not indefinite if the experimentation required is not undue." *Penda Corp. v. U.S.*, 29 Fed. Cl. 533, 554 (1993). Again, if a POSITA determines that surface contamination, from substances such as olive oil, rain water, or beach sand per Apple's hypotheticals, can cause cross-talk, the touch terminals are "closely spaced." A POSITA would be able to determine, without undue experimentation, whether a particular arrangement of touch terminals is sufficiently close such that contamination can cause crosstalk.

Apple fails to show that "closely spaced" is indefinite.

**B.    The Claims Are Not Indefinite Under *IPXL***

Apple argues that claim 37 and its dependent claims 38 and 39 are indefinite because claim 37 "recites an apparatus" and "a method of use for that apparatus" in violation of *IPXL Holdings v. Amazon.com*, 430 F.3d 1377 (Fed. Cir. 2005). Not so. In *IPXL*, the Federal Circuit held a claim invalid as indefinite because it recited "both an apparatus and a method of use of that apparatus" in a single claim. *Id.* at 1384. The claim recited: "[t]he system of claim 2 [including an input means] wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, and the user uses the input means to either change the predicted transaction information or accept the displayed transaction type." *Id.* The Federal Circuit held that the underlined language was an explicit method step, which required a "user" to actually "use[] the input means" to perform one of the recited actions. *Id.* This rendered the *IPXL* claim indefinite. *Id.*

Claim 37 has no such problem. Unlike *IPXL*, claim 37 does not recite a "user," or require a user to take any particular actions. Rather, claim 37 recites that there is an "oscillator providing a periodic output signal," and a "microcontroller using th[at] periodic output signal." This claim is infringed by making, selling, using, importing, or offering for sale any "system" that has the claimed "oscillator," "periodic output signal," and "microcontroller using [that] periodic output signal." There is no confusion about when infringement occurs, and *IPXL* does not apply. As Dr. Cairns explains, "[t]he claim clearly recites only a system … and the 'using' and 'selectively providing' language merely refers to the *capabilities* of that system," not a user's use of the system. Cairns Rebuttal Report, ¶ 199.

The Federal Circuit has routinely rejected similar arguments like Apple's. In *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307 (Fed. Cir. 2017), the Federal Circuit held that "[t]hough claim 8 includes active verbs—presents, receives, and generates—these verbs represent permissible functional language used to describe capabilities of the 'reporting module,'" and thus, "the claims at issue … merely claim that the system possesses the recited structure which is capable of performing the recited functions." *Id.* at 1315-16. The Federal Circuit has reached the same result in cases such as: (i) *UltimatePointer, L.L.C. v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016), finding not indefinite "a handheld device including: an image sensor, said image sensor generating

Glaser
Weil

1    data" because the "generating data" language merely "reflect[ed] the capability" of the "image senor,"

2    and did not require active use by a user; (ii) *Microprocessor Enhancement Corp. v. Texas Instruments*

3    *Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008), finding not indefinite "a pipelined processor" with various

4    claimed capabilities, because the claim was "clearly limited to a pipelined processor possessing the

5    recited structure and capable of performing the recited functions"; and (iii) *HTC Corp. v. IPCom*

6    *GmbH & Co., KG*, 667 F.3d 1270, 1277-78 (Fed. Cir. 2012), finding not indefinite a "a mobile station

7    … that achieves a handover … by" performing six enumerated functions, because the claims did "not

8    recite a mobile station and then have the mobile station perform the six enumerated functions … [they]

9    merely establish those functions as the underlying network environment in which the mobile station

10   operates."

11         Here, claim 37 is indistinguishable from the claims that were held definite in *MasterMine*,

12   *UltimatePointer*, *Microprocessor*, and *HTC*. Claim 37 recites an apparatus—a "capacitive responsive

13   electronic switching circuit"—which includes a number of physical components, including the

14   "microcontroller." The claim term "the microcontroller selectively providing signal output

15   frequencies" simply refers to a capability of the microcontroller. Claims are frequently written in this

16   way. Claim 37 does not require active use of the microcontroller by a user, and unlike *IPXL*, does not

17   recite any "user" term. Thus, Apple fails to show that claim 37 is indefinite.

18   **V.    CONCLUSION**

19         For the foregoing reasons UUSI respectfully submits that Apple's Motion be denied.

20

21    DATED: September 8, 2025                    Respectfully submitted,

22                                               GLASER WEIL FINK HOWARD
                                                  JORDAN & SHAPIRO LLP
23

24                                               By: */s/ Lawrence Hadley*
25                                                  LAWRENCE M. HADLEY
                                                     STEPHEN UNDERWOOD
26                                                   LARA A. PETERSEN
                                                     Attorneys for Plaintiff UUSI, LLC
27

28

UUSI, LLC'S OPPOSITION TO APPLE INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:18-cv-04637-JD